**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

THOMAS BITNER, TOSHIA
PARKER, and SAMANTHA
STANGL, individually and on behalf
of those similarly situated,

      Plaintiffs,

v.

WYNDHAM VACATION RESORTS,
INC.,

      Defendant.

Case No. 3:13-CV-00451 (WMC/SLC)

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
DECERTIFICATION OF THE CONDITIONALLY CERTIFIED CLASS UNDER
SECTION 16(b) OF THE FAIR LABOR STANDARDS ACT**

# TABLE OF CONTENTS

I.     **INTRODUCTION AND PROCEDURAL HISTORY** ........................................ 1

II.    **FACTUAL BACKGROUND** ................................................................. 4

     **A.**    The Issue Of OTC Work Was Raised And Addressed 8 Months Before The Litigation Started. ........................................ 4

     **B.**    Overview Of Sales Rep Duties At Wyndham's Mirror Lake Sales Office ... 6

     **C.**    Wyndham's Time Records, Policies, and Pay Practices. ............................. 8

        1.    Timekeeping Policies ......................................................... 8

        2.    Time Records, Pay Policies and Practices ....................................... 10

     **D.**    Plaintiffs' Testimony Of Hours Worked ....................................... 11

     **E.**    Plaintiffs' Days Are Not Typical Of One Another ................................... 13

        1.    Sales Reps Leave Work At Varying Times ................................... 14

        2.    Variable Downtime During The Workday ....................................... 16

        3.    Seasonal Changes In Hours Worked ............................................ 18

        4.    Varying Manager Communications About Hours Worked ............ 20

        5.    The Alleged OTC Work Varies Widely ............................................ 23

III.   **ARGUMENT** ................................................................................ 24

     **A.**    This Court Must Decertify A Collective Action Where The Fully Developed Record Demonstrates Establishing Liability And Damages For Each Opt-In Plaintiff Depends On Facts Unique To Each Plaintiff .......... 24

     **B.**    This Court Must Decide Credibility Issues That Impact Decertification ... 26

     **C.**    Summary Of Argument ......................................................... 28

     **D.**    The Record Demonstrates The Absence Of Any Single Company-Wide Policy That Violates The FLSA ................................................. 28

        1.    Even if a Company-Wide Unlawful Practice Were Found, it Still Must be Applied Uniformly ........................................... 29

        2.    Even If An Unlawful Practice Is Found, It Impacts Sales Reps Differently, Making Collective Treatment Impractical. .................. 31

     **E.**    The Factual And Employment Settings Of The Individual Plaintiffs Are Varying And Individualized ..................................................... 33

        1.    Plaintiffs' Alleged OTC Claims Are Highly Individualized And Therefore Cannot Be Proven Through Representative Testimony ....................................................... 34

| | | a. | Disparate OTC Hours And Credibility Issues...................... 35 |
| | | b. | Punch Times At End Of Day Vary Widely........................... 39 |
| | | c. | Whether A Sales Rep Works 4, 5 Or 6 Days A Week Affects Hours Worked, Especially Overtime .................................... 40 |

      2.   Whether Wyndham Is Liable For OTC Work Depends On A Multitude Of "Complicating" Factors Thereby Making Collective Adjudication Untenable.................................................................. 41

      3.   Damages Cannot Be Proven Through Representative Testimony... 44

**E.**   The Individualized Nature Of Wyndham's Defenses Precludes Collective Treatment Of Plaintiffs' Claims ............................................. 46

      1.   "Downtime" Is Sometimes Compensable And Sometimes Not; It Depends On The Circumstances...................................................... 46

      2.   Compensation For Non-Work Time May Off-Set Uncompensated OTC Work Time.................................................. 48

      3.   What Managers Knew or Should Have Known About OTC Work Varies .............................................................................................. 49

      4.   What Manager Told Sales Reps About OTC Work Varies......... 51

**F.**   Procedural And Fairness Considerations Militate Against The Maintenance Of A Collective Action ....................................................... 52

**IV.**   **CONCLUSION** .................................................................................................. 52

## I.    INTRODUCTION AND PROCEDURAL HISTORY.

In this FLSA collective action, sales-representatives at Wyndham's Mirror Lake sales office near Wisconsin Dells, Wisconsin allege they worked off-the-clock and not paid minimum wage and overtime as required. In July 2014, the Court granted conditional certification, finding, *inter alia*, that affidavits from named plaintiff Thomas Bitner and opt-in Plaintiff Abraham Haupt (plus a manager) met the "modest showing" required because both claimed:

> [t]hey worked on the clock in the morning but that managers instructed them to clock out for back-end sales meetings and customer events. Thus, they aver they regularly worked more than 40 hours per week but were not clocked in for some of that time.

(ECF No. 92, at 9).

Even though Wyndham submitted declarations from In-House Reps to the contrary, the court found:

> While these declarations suggest Plaintiffs may have an uphill battle ahead of them in proving the merits of their claim, as previously mentioned, the court resolves all factual disputes in their favor at the conditional certification stage. (citation omitted). For the present, therefore, the court must credit Plaintiffs' assertion that they were instructed by managers . . . to clock out before back-end meetings and customer events.

(ECF No. 92 at 10-11).

Resolving disputed facts in favor of conditional certification is common. Almost one year after the Conditional Certification Order, however, the record is fully developed.

Notices were sent to 117 potential opt-in Plaintiffs; 27 consents where filed.[1] Fourteen depositions of named and opt-in Plaintiffs were conducted. The Plaintiffs deposed 4 current or former Wyndham managers and 7 manager-level or higher representatives pursuant to a Fed. R. Civ. P. 30(b)(6) deposition notice. Over 24,000 pages of documents have been provided to the Plaintiffs, plus Wyndham's ESI productions of approximately 32,000 pages. The question this Motion presents is whether the Plaintiffs can establish they are "similarly situated" in light of their testimony, documents, and other admissible evidence.

The record demonstrates that establishing liability and damages for each opt-in Plaintiff will depend upon facts unique to each Plaintiff:

- 14 deposed Plaintiffs provided essentially 12 different estimates of hours worked. They range between 25 to 72 hours per week. (the Credibility Chart, Exhibit 1).

- 14 Plaintiffs' adopted estimates provided by their lawyers in their interrogatory answers. The two sets of estimates directly on another. (*See* p. 13, *Id.*).

- In January 2013, before this litigation, 7 of the 14 deposed Plaintiffs signed statements that they were paid for all hours worked. 7 more did not sign because they were not employed as Sales Reps at that time. (*See* p. 5-6).

---

[1] *Discovery Class of Sales Reps*: (total of 8): Stuart Abel, Jeff Brenner*, Robert Hale*, Elena Lahti, Toshia Parker, Nicholas Schulz*, John Wicklander, and Margaret Zautke*; and *In-House Class of Sales Reps*: (total of 23): D'Andrye Arthur, Thomas Bitner, Jeff Brenner, Thomas Delmore, Rueben Gonzales, Robert Hale, Abe Haupt, Justin Keegan, Jason Klidies, Ernest Lynch, Martin Mohr, John Montzingo, Casey O'Donnell, Ryan Rehberg, Christian Schartner, Nicholas Schulz, Christopher Sinople, Amber Staude, Sean Sweeney, Nathan Weyh, Darin Wimann, Jason Wright, and Margaret Zautke. (*Plaintiffs Brenner, Hale, Schulz, and Zautke worked in both the Discovery and In-House Departments during their respective employment; total number of plaintiffs filing consents is 27).

- 4 of the 14 deposed Plaintiffs stated under oath that they did not work more than 40 hours per week. (the Credibility Chart, Exhibit 1).

- 5 of 14 deposed Plaintiffs said they submitted applications for unemployment benefits while working as Sales Reps because their hours had been reduced. (the Credibility Chart, Exhibit 1).

- In weeks where 4 days or less are worked, overtime is less likely than when 6 days are worked. Selected data shows some Plaintiffs work 4 days or less as much as 60% of the time. (Duddleston Decl. ¶16; Mohr Dep. Ex. 80; Lahti Dep. Ex. 98; Parker Dep. Ex. 6).

- Some Sales Reps leave work as early as noon. Others remain at work until midnight on occasion. End times for 4 a sample of selected Plaintiffs range from 10:00 a.m. to 7:38 p.m. (*See* p. 40).

- All Plaintiffs leave work at different times each day and, as a result, hours worked are never the same for any other Sales Rep.

Illustrative is the testimony of opt-in Plaintiff Stuart Abel. In his deposition Abel testified he worked 8 hours a day, 5 days per week for a total of 40 hours per week during the busy season. During the non-busy season, he worked 25-30 hours per week. In his interrogatory answers, however, Abel claimed to work 65 and 42 hours per week during the busy and non-busy seasons respectively. His interrogatory answers were prepared by his lawyers and they list the exact same number of hours worked per week by busy and non-busy seasons—65 and 42—for each Plaintiff for each week. Interrogatory answers show overtime is due each week for Abel and all Plaintiffs who worked. This "underground" set of estimates is contrary to hours estimated by virtually all Plaintiffs deposed.

The implications of contradictions under oath are telling at this decertification stage. Abel did not know the number of hours or the assumptions his lawyers used. When

asked about these details during his deposition, he simply stated, "I would have to assume that what is on here (hours worked estimates) is accurate." (Abel Dep. 154). Of course, admitting the numbers in his interrogatory answers are inaccurate after signing them under oath as true and correct could be dishonest. But "assuming" they are accurate when they conflict with his own testimony to the contrary raises real questions the Court must address in this Motion. Similar contradictory estimates of hours worked exist for the other Sales Reps deposed as well.

Weeks with less than 40 hours worked cannot result in overtime liability and some Sales Reps admit working less than 40 hours in some weeks. Because of this, along with variations discussed e.g., seasonal, downtime, end times and other factors, liability will necessarily require a fact-finder to decide separately the hours worked for each Plaintiff for each week employed. The testimony of one Sales Rep cannot be imputed to another. Given the wide range in claimed hours worked, along with the many other variations discussed below, collective treatment of these claims simply will not work. Wyndham's Motion for Decertification should be granted.

## II.   FACTUAL BACKGROUND.

### A.   The Issue Of OTC Work Was Raised And Addressed 8 Months Before The Litigation Started.

By way of background, in the Fall of 2012, Wyndham In-House Reps, Abe Haupt ("Haupt") and Martin Mohr ("Mohr"), separately raised concerns to Dawn Franson ("Franson"), a Manager in Wyndham's Human Resources Department. (Franson Dep. 140-42, 151-52). Among other things, Haupt and Mohr discussed that they applied for a

medical leave of absence pursuant to Wyndham's Family Medical Leave Act ("FMLA") policy and their request was denied because they failed to work enough hours to be eligible. (Mohr Dep. 48-49; Haupt Dep. 83-84, 123; Franson Dep. 140-42, 151-52). Each reported that Wyndham's time records did not accurately reflect their hours worked. (*Id*.). In November 2012, Franson conducted an investigation. She interviewed Haupt and Mohr, 20 other Sales Reps,[2] and 6 sales managers. (Franson Dep. Ex. 6). In January 2013, Wyndham completed its investigation and concluded additional steps should be taken to ensure Sales Reps accurately record hours worked and managers understand their responsibilities for enforcing Wyndham's timekeeping policies. (*Id*.).

Wyndham conducted mandatory training for all sales managers and Sales Reps on Wyndham's timekeeping policies, practices, and expectations. (Franson Dep. 282-83). Additionally, Wyndham decided Sales Reps should be given an opportunity to express to the Company whether they believed they were owed money for off-the-clock ("OTC") work. (Franson Dep. 119, Ex. 6; Weyh Dep. Ex. 111). To that end, Wyndham asked employees whether or not the employee was paid for all hours worked. (Weyh Dep. Ex. 111; Klouw Dep. 40-41). In relevant part, Wyndham communicated to employees:

> "If you believe that you are owed for hours that you worked, please advise HR immediately and provide HR with the number of hours worked for which you believe you may be owed."

(Weyh Dep. Ex. 111). Forty-four (44) employees, including Plaintiffs Justin Keegan ("Keegan"), Elena Lahti ("Lahti"), Ernest Lynch ("Lynch"), Christian Schartner

---

[2] Sales Reps refer to both In-House and Discovery Sales Representatives unless further defined.

("Schartner"), Christopher Sinople ("Sinople"), Nathan Weyh ("Weyh"), and Margaret Zautke ("Zautke), confirmed in writing they were paid for all hours worked. (Franson Decl. III ¶5). One individual, Ashley Phillips ("Phillips"), notified Wyndham she believed she worked 9 hours but was not paid for this time. (Franson Dep. II 51; Klouw Dep. Ex. 3). Wyndham reviewed Phillips's claim and promptly paid for her claimed. (*Id*.). These steps and remedial measures occurred more than 8 months before this litigation.

      **B.**      **Overview Of Sales Rep Duties At Wyndham's Mirror Lake Sales Office.**

Wyndham is in the business of marketing and selling vacation ownership interests.[3] The events in this case occur at Wyndham's property known as the Glacier Canyon Resort at the Mirror Lake Sales Office located within the village of Lake Delton, Wisconsin, which lies immediately adjacent to Wisconsin Dells. (This facility is referred to in this Memorandum as "Wisconsin Dells".) [ECF No. 62]. In Wisconsin Dells,[4] sales operations are performed within three distinct departments including the Discovery

---

[3] An in depth overview of Wyndham's products and Sales Reps' work activities at the Mirror Lake Sales Office is included in Wyndham's opposition to Plaintiff's Motion for Conditional Certification, ECF No. 62.

[4] All declarations and deposition transcripts and corresponding exhibits cited to herein have been filed with the court. For ease of review, the deposition transcripts are identified by the witness' last name and page number (i.e. "Parker. #"). Moreover, the Exhibits referred to herein are referenced by the deposition in which it was identified and exhibit number (i.e. Parker Dep. Ex. #) unless otherwise specified. Declaration citations are identified by the witness' last name and paragraph number. Deposition Exhibits are attached to the Declaration of David Duddleston.

("Disco") Sales Department, the In-House Sales Department, and the Front Line Sales Department which is not part of this case.[5]

In-House Reps attempt to sell upgrades to Wyndham owners who already have an ownership interest. (Bitner Dep. 88-89). Unlike the Disco Reps, the In-House Reps are responsible for generating their own sales opportunities. (*See* Bitner Dep. 95-97). When an existing Wyndham owner arrives at the resort, Wyndham's marketing department schedules a welcome gift, typically delivered the next day. (Bitner Dep. 94-95). The next day, Wyndham's marketing department informs the In-House Department of all existing owners who checked in and are expecting a welcome gift. (Bitner Dep. 94-96). In-House Reps are assigned to meet with an owner, go to the owner's room, deliver the gift, and conduct a survey. (Sellers Dep. 15-17; Bitner Dep. 95-96).

This first meeting with the owner is referred to as a "front-end meeting," "tour," or "hook." (Bitner Dep. 102; 161-62). The goal of this first meeting is to set up a second meeting to talk about their ownership. (Sellers Dep. 17). At this second meeting, the In-House Rep presents the owner with options to upgrade their ownership levels, and thus,

---

[5] In approximately September/October 2014, the Front Line and In-House Sales Departments were combined so that the Sales Representatives within either department can work in both departments to more effectively manage the labor they provide and to increase the opportunity to earn money from commissions. (*See* e.g. Sellers Dep. 73, 75). For purposes of this Decertification Motion, the change is not relevant because the Plaintiffs dismissed the Front Line Sales Reps from those sought to be included in the lawsuit, the time to opt-in expired, and the Court defined the 2 classes consisting only of In-House and Disco Reps. [ECF No. 92].

vacation opportunities.[6] (Sellers Dep. 17). This second meeting is referred to as a "continuance" or a "back-end" meeting. (Sellers Dep. 17).

Unlike In-House Reps, Disco Reps do not sell ownership interests. Rather, they attempt to sell a vacation package for a stay which is essentially a pre-paid, resort-type stay to an owner or potential buyer who declined to purchase points. (Sellers Dep. 50-51). The potential buyer may "discover" the value of and buy the points at a later date. (*Id.*). The vacation package is essentially a retail product. Sales tax is paid on the package and the product looks similar to what a person buying a packaged, pre-paid vacation from a tour company or travel agency might receive. (Lahti Dep. 21-22).

As is apparent, Disco and In-House Reps each handle distinctly different sales. The products have different goals, the percentage commissions paid and/or bonus varies substantially from one product to another. The two groups have separate supervisors and managers, typically have different hours of scheduled work, different start and end times, practices, sales staff, and decision makers.

###    C.    Wyndham's Time Records, Policies, and Pay Practices.

####        1.    Timekeeping Policies.

Wyndham maintains written timekeeping and overtime policies which are, in turn, communicated to and available to Sales Reps. Its policies are found in Wyndham's Employee Handbook [ECF No. 63 ¶¶1-2, 4, 6, Exs. A-B, D, and F], in standalone polices which employees acknowledge receiving by their signature (*Id.* at ¶¶3, 5, Ex C and E), on

---

[6] Wyndham's vacation product is a points-based system. Wyndham owners use their points for such things as airfare, car rentals and resort stays. (Sellers Dep. 18).

the company's "WebConnect site" (*Id.* at ¶¶7-8, Ex. G-H; Franson Decl. ¶6), in its "Rules of Engagement" policy (Franson Decl. I ¶6)[7], and in its Standards of Performance Agreement. (*Id.*). Newly hired Sales Reps are trained on these policies and practices. (Franson Dep. II, 149, 157-158).[8]

Wyndham's written policies on timekeeping and overtime unequivocally state that "**under no circumstances should an employee begin work before clocking in**" and "**the Company is required to and will pay employees for all hours worked.**" [ECF No. 63, ¶2, Ex. B]. Moreover, the policy provides that "**if an employee is working but not at the work site, they are expected to notify their manager in writing . . . of any hours worked**." (*Id.*). The policies define work to include "**performing project assignments, checking company related email or voice mail, receiving inbound or making outbound telephone calls with owners, guests or other employees regarding work-related issues after work hours are considered time worked. This type of work requires submission of a Timekeeping record.**" (*Id.*). Wyndham also informs employees that consistent with its timekeeping and overtime policies, "**all overtime, approved or unapproved, must be paid.**" [ECF No. 63 ¶¶ 3, 5, Exs. C and E].

Wyndham uses an electronic timekeeping system ("Wyntime") to track employee hours of work. (Franson Decl. I ¶8). If the employee forgets to punch in or out on a particular day or the employee notices that the time recorded is incorrect, the employee can inform his or her manager of the discrepancy and complete a missed punch form to

---

[7] Franson Declarations will be referenced to as follows: ECF No. 50 (Franson Decl. I), ECF No. 121 (Franson Decl. II), ECF No. 159 (Franson Decl. III).
[8] Franson Dep. II refers to the April 14, 2015 deposition transcript of Dawn Franson.

correct the inaccurate time entry. (Parker Dep. 154). A manager may also initiate completion of a miss punch report in these circumstances. (*Id*. at 277). When an employee completes a missed punch form, the employee's Wyntime record is corrected to reflect the hours worked identified in the missed punch form. (Franson Dep. II 91-92).

### 2. Time Records, Pay Policies and Practices.

Wyndham's pay policy is straightforward. It is contained in Wyndham's Handbook, it is reviewed with new Sales Reps when hired, and Sales Reps receive reminder training periodically throughout their tenure. (Franson Decl. I ¶6-7; Franson Dep. II 157-158; Franson Dep. 70). Wyndham's Pay Policy requires that Sales Reps are paid for all work performed. [ECF No. 63-1; Duddleston Decl. ¶23]. Work must be performed only when a Sales Rep is "clocked in" to Wyntime. (*Id.*). Sales Reps are expected to clock out when they are not working such as during meal breaks or significant periods of "down time" during the day when they are free to leave the sales area and go about their personal business. (*Id.*).

Wyndham compensates Sales Reps as follows: Sales Reps are paid minimum wage for all hours worked, commissions, bonuses, and overtime if the Sales Rep works over 40 hours in a given work week. (*See* Willis Decl. ¶2, Ex. A, p. 4-9). The minimum wage is treated as an advance against the Sale Rep's future commissions. (Willis Dep. 16; Willis Decl. ¶2, Ex. A, p. 4). Since the minimum wage draw is an advance, it is recovered by Wyndham when the Sales Rep earns enough in commissions to "payback" or "recover" the amount advanced by the Company. (*Id.*). If the Sales Rep does not earn enough in commissions to pay back the advanced draw, the remaining amount of the

advance is considered a "draw balance" and simply is carried forward from pay period to pay period until the draw balance is fully recovered from commissions earned or the Sales Rep stops working. (Willis Dep. 24-25).[9]

Regular (straight time) compensation provided to Sales Reps in a given week is intended to cover all work performed within that week. (Willis Decl. ¶2, Ex. A, p. 4). Wyndham also pays Sales Reps overtime compensation when the Sales Rep works more than 40 hours in a work week. (*Id*. at p.6; Willis Dep. 23-24). Overtime pay is determined by calculating a Sales Rep's regular rate of pay (total earnings for that workweek divided by all hours worked during that workweek and multiplying the hours worked over 40 by 0.5 times the regular rate). (Willis Decl. ¶2, Ex. A, p. 6). A separate overtime calculation based on the Sales Rep's regular rate of pay is made for separate categories of compensation (draw pay, commission, or bonus) paid to the employee. (Willis Dep. 42-43, 53-55; Willis Decl. Ex. A, p. 6-9). The overtime rate on a Sales Rep's commission and/or bonus is calculated based on the actual sales contract that generated the commission, taking into account whether the contract was rescinded. (*Id*.).

**D.     Plaintiffs' Testimony Of Hours Worked**.

Sales Reps claim they worked OTC, and as a result, are entitled to additional compensation in the form of minimum wage and overtime. Central to this OTC claim is the Plaintiffs' contention their hours were under-reported. Plaintiffs have no independent recollection of the hours worked in a given week and therefore estimate their hours

---

[9] For some employees, the draw is never a factor.  Ernest Lynch for example, was a top producer. He was "absolutely" the best deal closer in the In-House Department (Lynch Dep. 49). Lynch earned $394,564 in 2013. (Lynch Dep. 166-67).

worked. (*See generally* Sinople Dep. 39, 52; Keegan Dep. 137; Weyh Dep. 65). These estimates are at most, "best guesses". They demonstrate a wide variation in hours worked.

One Sales Rep (Abel) said he did not work over 40 hours in a week in the busy season and between 25-30 hours in *the* non-busy season up until the last year of his employment.[10] *See Infra* the Credibility Chart, Exhibit 1. Another Sales Rep (Lahti) said she too worked between 25-30 hours per week in the non-busy season. (*Id.*). Still another (Lynch) first said in a declaration in Fall 2013 he worked between 36-39 hours in a week. (*Id.*). Then after his termination, he said he averaged 60 hours per week. (*Id.*). These estimates show a wide variation among the group. A fact-finder will have to decide the hours worked for each Plaintiff in order to decide whether liability exists for each Plaintiff for each week. For example, a fact finder will need to resolve the following conflicting contentions:

| Plaintiff | HRS Worked/Week Testimony | ROG—HRS Worked | Declaration—Paid for all HRS Worked |
|---|---|---|---|
| Thomas Bitner | Avg of 50. | 65 HRS in busy season; 42 HRS in slow season | N/A |
| Ernest Lynch | Avg. of 60. | 65 HRS in busy season; 42 HRS in slow season. | Yes. Worked between 36 and 39 HRS per week. |
| Christopher Sinople | Avg. of 20-25 in non-busy season; 60 in busy season. | 65 HRS in busy season; 42 HRS in slow season. | N/A |
| Christian Schartner | Avg. 55 in busy months; Closer to 40 in slow season. | 65 HRS in busy season; 42 HRS in slow season. | N/A |
| Stuart Abel | Wyntime records accurate until Spring 2013; | 65 HRS in busy season; 42 HRS in slow season. | Yes. |

---

[10] Abel said Wyndham's time keeping system was accurate until Spring 2013 so the above estimates to apply to balance of 2013. (Abel Dep. 108, 111, 120-21).

| | Avg. 40 in busy season; Avg. 25-30 in slow season. | | |
|---|---|---|---|
| Elena Lahti | In slow season Lahti works average of 25-30 HRS/wk (5-6 HRS/day). | 65 HRS in busy season; 42 HRS in slow season. | Yes. |

Chart Exhibit 1 (attached hereto).[11]

**E.      Plaintiffs' Days Are Not Typical Of One Another**.

All Plaintiffs agree there is no such thing as a "typical day" at Wyndham, as confirmed by the following testimony from In-House and Disco Reps:

- "[e]very day was different." (Keegan Dep. 17).
- "[n]o typical day as an In-House Rep, each stay stood on its own. (Sinople Dep. 36).
- "[t]here were always variances in the day as to how many people, how many guests we would see when we would see someone, what time we would be able to eat lunch, if we got to eat lunch, when we would be finished." (Lahti Dep. 37).
- "all of my clock-in, clock-outs varied week to week . . . everything time wise varied." (Lahti Dep. 54, 57).

It therefore comes as no surprise that each Plaintiff's day, and corresponding hours of work, are different. Through deposition testimony, Plaintiffs confirmed their weekly and daily work experiences were impacted by a multitude of factors, including: manager directives, how tours were scheduled, tour time, number and length of tour, position on power line, type and length of work activity, downtime, day of the week, staffing levels, type of tour, whether a sale was made, seasonality, and resort occupancy. (*See Infra* Chart

---

[11] A complete listing for all 14 Plaintiffs deposed showing the information above plus additional information reflecting on the difficulty of determining hours worked with citations to the record is attached as Exhibit 1 to this memorandum and incorporated herein.

at p. 46). To illustrate Plaintiffs' inconsistent hours of work, several of these factors are discussed in more detail in the Factual Background section below.

**1.      Sales Reps Leave Work At Varying Times**.

Sales Reps generally leave work when their last tour of the day is over. (Mohr Dep. 53-54). However, tour start and end times vary considerably day to day and, thus, are not predictable. [12] As a result, the Plaintiffs stop working at different times. (*Id.*).

Deposition testimony from In-House Reps confirms this fact. (Lynch Dep. 125) (In-House Reps left work at different times and the end time varied day-to-day); (Schartner Dep. 14) ("we never really knew, walking in, how many hours we were going to be working."); (Weyh Dep. 58) (did not know when he walked into work in the morning what time his workday would end).

Disco Reps provided similar deposition testimony. For example, Zautke testified each Disco Rep ended their work day at different times, every day, all the time. (Zautke Dep. 75-76). When Lahti was asked whether she had a standard time she left every day, she said: "Oh, no. No." (Lahti Dep. 39).

Disco Rep testified they were sometimes able to leave work at 2:00 p.m., sometimes they left closer to 4:00 p.m.; other times it was 7:00 p.m. (Parker Dep. 133-34;

---

[12] How tours are scheduled explains why there is not a "typical day". A Sales Rep's position on the "power line" (a system for determining which Sales Rep receives the first, second, etc. tour) may dictate when the Sales Rep gets a tour, which varies regularly. (Parker Dep. at 166-69). Moreover, the timing of a tour is complicated by the fact that there is no set scheduled time for a back-end meetings or a discovery tour. (Sinople Dep. 34; Weyh Dep. 33) (explaining back end meetings were scheduled based on owner preference) (Parker Dep. 170-72) (her ability to meet with a prospective owner was based on when Front Line or In-House tours ended, which varied); (Sellers Dep. 53-54).

Lahti Dep. 45-46). The time a Disco Rep left work on a given day varied based on the number of tours scheduled and whether it was his or her turn to be the Disco Rep to stay until the last tour was over. (Parker Dep. 171-72; Lahti Dep. 43-46). The length of time a Disco Rep meets with a customer also impacts when the Sales Rep can leave for the day as those meetings ranged from 5 minutes to 2 hours. (Lahti Dep. 43; Zautke Dep. 74). Lahti was unable to provide a range as to when different Disco Reps would leave because "it was contingent on the number of guests that we had, where everybody was in the [power] line."[13] (Lahti Dep. 44).

Similarly, In-House Reps testified the length of a back-end meeting is highly variable and impacts his or her hours of work and the time the Sales Rep leaves for the day. (Lynch Dep. 30; Schartner 38; Keegan 56; Sinople Dep. 72-73). In their respective depositions, In-House Reps identified the length of back end meetings ranged as follows:

- From two hours to six hours.[14] (Lynch Dep. 30).
- From 5 minutes to five hours. (Keegan Dep. 56).
- From 10 minutes to hours and hours. (Sinople Dep. 72-73).

Moreover, deposition testimony from In-House Reps confirms Sales Reps left work at inconsistent times. Specifically, In-House Reps gave testimony as follows:

---

[13] A Disco Rep's end time also depended on how much effort he or she put into their last sales pitch for the day. For example, if a Disco Rep really wanted to leave, she could "toss" her last tour and be done, *i.e.*, provide minimal effort in order to get it over with. (Lahti Dep. 44, 79). In contrast, a different Disco Rep could really "dig in" and spend up to two hours with a customer. (Lahti Dep. 44).

[14] An In-House Rep's position on the power line impacts the workday and, ultimately, hours worked. For example, Lynch testified that because he normally was at the top of the power line, he had more back-end meetings and, as a result, worked more hours than a representative who was at the bottom of the line. (Lynch Dep. 42-43).

- Lynch testified a basic day for him meant he left for the day sometime between 2:00 p.m. and 7:00 p.m. (Lynch Dep. 37).
- Schartner testified some days he only worked four hours, and other days he was at work until 9:00 p.m. (Schartner Dep. 14). Schartner recalls times where he was done with his workday prior to lunchtime. (Schartner Dep. 16). He also recalls days where he left before 4:00 p.m. (Schartner Dep. 16).
- Bitner could leave work as early 3:00 p.m. (Bitner Dep. 161). Sometimes the time he left work was closer to 6:30 p.m., other times it was as late as 11:00 p.m. (Bitner Dep. 156, 160-61).

### 2. Variable Downtime During The Workday.

Sales Reps also experienced periods of downtime throughout their work day, i.e. between tours, wherein they had no work to perform. (Haupt Dep. 178-79); (Greg Metzler Decl. ¶11 (would run a personal errand)). The amount of downtime an individual In-House Sales Rep has in a given work day varies daily based on the number of tours scheduled, when the tours are scheduled, staffing levels, and the amount of work-related tasks the Sales Rep has to complete. (Zautke Dep. 166-67; Lahti Dep. 64-65; Abel Dep. 129-131).

In depositions, In-House Sales Reps provided a range of testimony about downtime. On one end of the extreme is Mohr, who testified he did not have any downtime at all during his day. (Mohr Dep. 114) ("I don't believe I had down time."). Haupt, on the other hand, testified there were times during a particular work shift where he had no work to do for several hours. He would, therefore leave Wyndham's facility, grab something to eat, and, on at least one occasion, watch a football game. (Haupt Dep. 178-79; *See also* Sinople Dep. 147-48) (employees would leave to watch football, and go to the mall).

Schartner observed other Sales Reps engaging in strictly personal activities such as reading a book or playing with a smartphone for varying periods of time during the workday. (Schartner Dep. 77-78). As for Schartner himself, he also had downtime and it "[v]aried. Varied greatly." (*Id.*). He did the same type of things that he observed his co-workers doing and he claims he was often OTC during these periods. (Schartner Dep. 79); *See also* Sinople Dep. 146. (Sinople testified that he went to a casino during his downtime.) (Q: Did you ever hear of employees going to the casino? A: Sure Q: Yeah? A: Guilty.")).

Lynch, however, was somewhere in between. He claims he would participate in training and conduct follow-up calls during periods of downtime. (Lynch Dep. 74). Yet, he also recalls instances in which he ran personal errands such as attending a doctor's appointment, running to the mall or Kohl's to shop during the workday and that he would punch out if he did so. (Lynch Dep. 108-09).

Disco Reps also confirmed that during a given work shift there is "downtime" where the Disco Sales Rep is not giving sales pitches to prospective clients and does not do anything work-related. (Parker Dep. 244-45). While Parker states the amount of downtime varied from 3 minutes to 30 minutes, she also admits she had time to read a book and take lunch breaks during these downtime periods. (*Id.*).

When Zautke had periods of downtime during her day she would: call her mother, call her husband, search Facebook, just talk to other people.[15] (Zautke Dep. 167). However, sometimes she would "hawk" meetings customers were having with other Sales Reps in an attempt to anticipate what the owner's objectives were before they came to see her. (Zautke Dep. 167-68). Zautke testified that her downtime could range anywhere from five minutes to four hours. The amount of downtime in Discovery "all depends on the day." (Zautke Dep. 167). Although some days were busier, "there's some downtime in most days." (Zautke Dep. 167).

Lahti testified she sometimes had 4-6 hours "of not doing anything, not speaking with anyone . . ." (Lahti Dep. 67). During lengthier periods of downtime, Lahti would play video games on her phone, including "Candy Crush," or grab coffee. (Lahti Dep. 65). Lahti admits sometimes she was able to leave work during such periods of downtime and other times she did not leave work because she was worried she would miss her next sales opportunity. (Lahti Dep. 65-66, 73-74).

### 3.      Seasonal Changes In Hours Worked.

No agreement exists among the In-House Reps as to whether there is a busy or non-busy season at in Wisconsin Dells. Haupt rejected the notion there was a non-busy season for In-House. To him, the amount of work he performed was the same all year. (Haupt Dep. 141). Bitner testified that his work in the In-House Department was fairly consistent year round. (Bitner Dep. 113). Mohr agreed there was some variation in his

---

[15] Zautke observed that other Sales Reps had downtime during their work day. She saw other Disco Reps talking, watching a sports game on TV or using their own personal laptops. (Zautke Dep. 165).

hours based on the season, but it was hard for him to say "because the lower [non-busy] season could be the same as the busy season." (Mohr Dep. 111-12).

In contrast, Sinople testified that the season would impact the number of hours he worked in a given week. (Sinople Dep. 54). He worked less in slower seasons because decreased resort occupancy translated into fewer sales opportunities and fewer hours worked. (Sinople Dep. 153). Schartner was unequivocal that there was a busy and non-busy season. (Schartner Dep. 80). Schartner considered January and February to be slower months, however, even in the middle of one of these "dead" months, there could be some very busy days. (Schartner Dep. 80). Schartner agrees that he generally worked less hours from approximately October through March any given year. (Schartner Dep. 102-03). According to Zautke, who worked in In-House for a period of time, her hours of work "changed all the time, but yeah, some of it had to do with the season." (Zautke Dep. 128).

Many Disco Reps acknowledge their workload varies based on the time of year. For example, in May, Lahti averaged five or six hours a day and, as a result, she did not generally work more than forty hours a week. (Lahti Dep. 124-25). The same holds true for January. (Lahti Dep. 125). Based on Lahti's observations, other Disco Rep's hours would vary month to month in the same manner described above. (Lahti Dep. 125-26).

While Disco Reps generally agree seasonality impacts their hours of work, they do not agree on the details of busy and non-busy seasons. Their differing testimony on seasonality is summarized in the chart below.

| Plaintiff Name | Definition of "busy season" |
|---|---|
| Parker | <ul><li>June through August.</li><li>March through April.</li><li>A couple of miscellaneous busy weeks around holidays such as Christmas and Valentine's Day.</li></ul>(Parker Dep. 68-69; 135; 137-138). |
| Lahti | <ul><li>After Labor Day, the work would slow down "a little bit." It would then remain steady through "October-ish" (Lahti Dep. 121).</li><li>It would slow down for a "little bit" in the beginning of November and then be slow overall from mid-November through January. (Lahti Dep. 121-22).</li><li>There would be a little "pop" in business for Christmas and the New Year holiday. (Lahti Dep. 122).</li><li>There is another spike in business over the spring break period, running through March and April. (Lahti Dep. 123).</li><li>May through mid-June is "quiet, quiet, quiet." [16] (Lahti Dep. 123).</li><li>October was "hit or miss" (Lahti Dep. 126).</li></ul> |
| Zautke | <ul><li>Busy season includes most of March and April, June, July and August, portions of October, the last two weeks in November, and last two weeks in December and the first two weeks in January. (Zautke Dep. 122).</li><li>Busy season can vary year to year. Discovery was busy for the entire months of March and April in 2013. However, in 2014, it was only busy for four of the eight weeks, March through April. (Zautke Dep. 124-25).</li></ul> |

### 4. Varying Manager Communications About Hours.

The In-House Reps did not receive the same information from their managers with respect to Wyndham's timekeeping policies and procedures. Bitner would punch out after

---

[16] There are also instances in which a particular month can be busy and slow even within the same month because the Wisconsin Dells "is such a tourist town." (Lahti Dep. 128). Thus, with regard to hours worked, "there wasn't a consistent basis for anything." (Lahti Dep. 128).

the In-House tours were over, he claims, because managers would tell him to clock out of Wyntime before starting back-end meetings. (Bitner Dep. 262-63). However, a number of In-House Reps apparently never got that message. Keegan does not recall being told to punch out after lunch and to stay punched out for the rest of the day. In fact, Keegan indicated being asked to do that would be "kind of weird." (Keegan Dep. 120); *see also* (Weyh Dep. 52) (stating his manager instructed him to always be on the clock when meeting with an owner and he followed her directive).

Bitner's claim that he was forced to punch out after lunch also conflicts with the testimony of other In-House Reps who submitted declarations stating they always were on the clock whenever they were speaking with owners or giving a sales pitch. (Decl. of Adam Karls ¶10, 12-13) (affirming he records as hours worked all the time he spends on work related activities).[17] Other In-House Reps testified as follows regarding instructions given by managers regarding timekeeping:

- When O'Donnell was a manager he alleged there was an "unspoken" practice of Sales Reps working OTC. (O'Donnell Dep. 136). No one ever explained why the Sales Reps should not record more than 40 hours. Managers, nevertheless, understood, "Do not let them do over 40 hours." (*Id.* at 116-17).

- When Dave Brown was his manager, Haupt was instructed to punch back in (and therefore be on the clock) after lunch. (Haupt Dep. 97; *cf* Bitner Dep. 262,

---

[17] *See also* Decl. of Larry Lynch ¶10-11(stating he recorded all of his time spent in back-end meetings as hours worked); Decl. of Max Keeling ¶14-15 (confirming no one at Wyndham told him not to clock in for back end meetings and affirming he records all time spent in back end meetings as hours worked); Decl. of Greg Metzler ¶9, 13-14 (stating he records all the time he spends on work-related activities in Wyndham's electronic timekeeping system and has recorded all time spent in back-end meetings or takeovers as hours worked).

alleging the opposite). Brown ran an honest operation and allowed Haupt to honestly record the time worked. (Haupt Dep. 151).[18]

- Schartner was "essentially instructed" to work OTC by his manager, Tom Delmore. Other managers did <u>not</u> give him that instruction. (Schartner Dep. 67-68). Schartner got the "vibe" from Managers Christine Kwitek and Lance Tinsley that he should work OTC. (Schartner Dep. 69).

- Sinople's manager talked to him about managing his hours when he got close to forty hours in a work week. (Sinople Dep. 38-39). Sinople was told to clock out while working but that was not a regular occurrence. (*Id*. at 127).

The Disco Reps testimony also confirms the absence of uniform directives from managers relating to Wyndham's alleged "illegal pay policy" requiring employees to work OTC. Disco Reps claim managers gave them the following directives regarding timekeeping and overtime:

- Do not work more than 40 hours in a week.[19] (Parker Dep. 152, 194). ("someone told me not to go over 40 hours, yes.".)

- "[M]anage your hours wisely." (Zautke Dep. 51-52). Code for "don't get caught with having . . . more than 40 hours."[20] (Zautke Dep. 51).

- Manage hours to keep them under 40 per week. (Lahti Dep. 33).

- Other Disco Reps were never told by a manager to punch out and keep working. (Lahti Dep. 34-35).

---

[18] Haupt has no complaint that he was being cheated on his hours while Brown was his manager. (Haupt Dep. 151).

[19] Yet, Parker acknowledged that no manager ever told her she needed to keep her hours as low as possible or that she had to punch in and out of Wyntime at certain times. (Parker Dep. 194-95, 223).

[20] Zautke also believes that as part of this same unspoken code, she should still work all the hours she was scheduled. (Zautke Dep. 51). However, this second part of the code was *unstated*. (Zautke Dep. 51). An additional part of this alleged code was that she could make more money if she worked OTC. (Zautke Dep. 51-52).

## 5.     The Alleged OTC Work Varies Widely.

Many In-House Reps claim they performed OTC work but the type and amount of such work lacks consistency among Plaintiffs. Depending on the manager, Haupt claims he would sometimes be required to attend training sessions OTC, but the frequency was "all circumstantial." (Haupt Dep. 94-95). On the issue of returning owner calls In-House Reps gave the following conflicting testimony:

- Lynch claims he did not record time spent talking with owners. (Lynch Dep. 18). The time associated with these owner calls ranged from 30 minutes to an hour or two each night.  (Lynch Dep. 19, 119). The amount of time Lynch spent talking to owners varied. "Some days I took more calls; some days I took less." (Lynch Dep. 116).

- Keegan "rarely" talked with owners on his off time. (Keegan Dep. 126-27).

- Sinople testified that he took or made calls to owners OTC. These calls ranged from 2-30 minutes in length. (Sinople Dep. 135).

Similar differences exist when examining certain Plaintiffs' claims they were not paid for training activities or party weekends. (Bitner Dep. 194) (explaining not paid to attend training) *cf* (Schartner Dep. 89) (admitting he was paid for some trainings); (Lynch Dep. 85-87, 91-93) (claiming forms used to record his time spent at "party weekends" are inaccurate); *cf* (Schartner Dep. 64) (admitting he was paid for attending a party weekends); (Keegan Dep. 121) (no recollection of being told to avoid recording time spent on party weekends).

Disco Reps performed different types of OTC work at different times on different days. As noted above, Parker allegedly performed work OTC depending on her position on the power line. (Parker Dep. 183). Lahti confirmed her alleged OTC work varied day

by day. (Lahti Dep. 119). At times, Lahti would perform OTC in the morning before she saw her first customer. Sometimes she would work OTC throughout the course of her workday, including instances in which she failed to punch back in from lunch. As for Zautke, she claims she performed work OTC in the mornings. (Zautke Dep. 129). However, whether she performed OTC work at other points of the day depended on whether she was "managing" her hours. (Zautke Dep. 129).

III.   **ARGUMENT.**

   A.   **This Court Must Decertify A Collective Action Where The Fully Developed Record Demonstrates Establishing Liability And Damages For Each Opt-In Plaintiff Depends On Facts Unique To Each Plaintiff.**

Section 16(b) of the FLSA, 29 U.S.C. § 216(b), permits Plaintiffs to bring a collective action on behalf of themselves and others who are "similarly situated." [Order, ECF No. 92, July 25, 2014 at 4 ("Order")]. Maintenance of a Representative action under Section 16(b) of the FLSA is a two stage process. [Order, (citing *Austin v. CUNA Mut. Ins. Soc'y*, 232 F.R.D. 601, 605 (W.D. Wis. 2006)]. As this Court noted, the first stage involves conditional certification based upon a "fairly lenient" standard which requires only a "modest factual showing" by the Plaintiffs. [Order at 5 (citations omitted)]. Although Plaintiffs were successful in meeting their meager evidentiary burden at the first stage, the standard has now changed.

Wyndham's Motion brings the case to a crucial second stage. At this point, "the court determines whether the Plaintiffs are *in fact* similarly situated to those who have

opted in." [Order at 6].[21] As one court described it, the second stage "is where the rubber meets the road." *Pickering v. Lorillard Tobacco Co., Inc.*, 2012 U.S. Dist. LEXIS 10421, at *20 (M.D. Ala. Jan. 30, 2012).

With the benefit of a far more robust factual record than at the conditional certification stage, the Court must make a "more stringent" factual determination as to whether the class is truly similarly situated. *Russell v. Ill. Bell Tel. Co.,* 721 F. Supp. 2d 804, 811 (N.D. Ill. 2010). At the decertification stage, "the similarities necessary to maintain a collective action under § 216(b) [sic] must extend beyond the mere facts of job duties and pay provisions." *Anderson v. Cagle's Inc.*, 488 F.3d 945, 953 (11th Cir. 2007) (citation omitted), *cert. denied*, 553 U.S. 1093 (2008); *see also Marshall v. Amsted Rail Co., Inc.*, Case No. 10-cv-0011-MJR-SCW, 2012 U.S. Dist. LEXIS 161768, *10 (S.D. Ill. Nov. 13, 2012); [Order at 8 (citing *Viveros v. VPP Grp., LLC*, No. 12-cv-129-bbc, 2013 U.S. Dist. LEXIS 97997 (W.D. Wis. July 15, 2013)].

At this second stage, the burden still remains with the Plaintiffs to show they are similarly situated. *Russell*, 721 F. Supp. 2d at 811. The analysis of whether employees are similarly situated is comparable to the "typicality" and "commonality" requirements of a Rule 23 class certification. *Freeman v. Total Sec. Mgmt. - Wis., LLC*, No. 12-cv-461-wmc, 2013 U.S. Dist. LEXIS 112871, at *12 (W.D. Wis. Aug. 9, 2013) (citing

---

[21] *See also Orquiza v. Walldesign, Inc.*, No. 2:11-CV-1374 JCM (CWH), 2012 U.S. Dist. LEXIS 115433, at *5 (D. Nev., Aug. 16, 2012) ("the 'decertification stage,' has a much higher standard of proof"); *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1261 (11th Cir. 2008) ("second stage is less lenient, and the plaintiff bears a heavier burden"); *Luksza v. TJX Cos.*, No. 2:11-cv-01359-JCM-GWF, 2012 U.S. Dist. LEXIS 111864, at *23 (at the second stage the "plaintiffs must clear a higher hurdle to continue") (citation omitted).

*Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770 (7th Cir. 2013)). Indeed, when analyzing certification under Section 16(b) of the FLSA and under Rule 23 of the Rules of Civil Procedure, the Seventh Circuit confirmed, "[t]here isn't a good reason to have different standards for the certification of the two different types of action." *Espenscheid*, 705 F. 3d at 772. Consequently, "while analyzing decertification under FLSA precedent, the court can look to Rule 23 for additional guidance." *Smith v. Family Video Movie Club, Inc.*, Case No. 11 C 1773, 2015 U.S. Dist. LEXIS 43335, at *10 (N.D. Ill. Mar. 31, 2015).

In deciding whether decertification is appropriate, courts take into account:

(1)     whether the factual and employment settings of the individual Plaintiffs are similar or disparate;

(2)     whether defendants may assert various defenses that appear to be individual to each Plaintiff; and

(3)     whether fairness and procedural considerations support proceeding as a collective action.

*Espenscheid v. DirectSat USA, LLC*, 09-cv-625-bbc, 2011 U.S. Dist. LEXIS 56062, at * 14 (W.D. Wis. May 23, 2011) (citations omitted). Now, the central question is whether potential Plaintiffs are actually similar such that a collective action will facilitate efficient resolution of a legal dispute involving claims which share common questions and common answers. [Order at 6 (citation omitted).]

**B.     This Court Must Decide Credibility Issues That Impact Decertification.**

In contrast to the conditional certification stage, when considering whether to decertify a collective action, courts consider the three factors listed above and resolve

factual disputes relevant to certification even if they also go to the underlying merits of the claims. *See Whitaker v. 3M Co.*, 764 N.W.2d 631, 636 (Minn. Ct. App. 2009) (requiring a "definitive assessment" of class-certification requirements, even if they coincide with merits issues)[22]; *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672 (7th Cir. 2001) ("Before deciding whether to allow a case to proceed as a class action, therefore, a [district court] should make whatever factual and legal inquiries are necessary under Rule 23 . . . and resolve [factual] disputes before deciding whether to certify the class."); *see also Freeman*, 2013 U.S. Dist. LEXIS 112871, at *13-14 (finding that in cases where commonality is disputed, there is significant overlap between fact issues relevant to liability and those that must be resolved in order to determine if the class should be certified so the court must determine such fact issues).[23]

Resolving factual disputes related to the underlying claims at the decertification stage necessarily means the Court must also resolve credibility issues at this stage. *See Viveros*, 2013 U.S. Dist. LEXIS 135242, at *5-6 (explaining "[p]laintiffs cannot show

---

[22] *See also Blades v. Monsanto Co.*, 400 F.3d 562, 567 (8th Cir. 2005) (explaining that "[t]he preliminary inquiry at the [R. 23] class certification stage may require the court to resolve disputes going to the factual setting of the case, and such disputes may overlap the merits of the case") (citation omitted); *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 366 (4th Cir. 2004). ("[W]hile an evaluation of the merits to determine the strength of Plaintiffs' case is not part of a [class certification] analysis, the factors spelled out in Rule 23 must be addressed through findings, even if they overlap with issues on the merits").

[23] These cases address Rule 23 certification requirements, however, the "'similarly situated' requirement of the FLSA resembles the commonality and typicality requirements of Rule 23." [Order, ECF No. 92, July 25, 2014 at 8, n.3 (citing *Espenscheid*, 705 F.3d at 771-72)]. This determination is best left up to the decertification stage. *Id.* at 8. The analysis on whether employees are similarly situated is comparable to the "typicality" and "commonality" requirements of a Rule 23 class certification. *Freeman*, 2013 U.S. Dist. LEXIS 112871, at *12.

that common questions of law or fact predominate over individual questions . . . by citing

one employee's testimony while ignoring contrary testimony of the other potential class

members"); *Whitaker,* 764 N.W.2d at 640; *Cruz v. Unilock Chi., Inc.*, 892 N.E.2d 78 (Ill.

App. Ct. 2008) (in deciding a motion for class certification, a trial court need not accept a

plaintiff's factual assertion where the evidence shows the facts to be different as it is the

Court's proper role to resolve such disputes); *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d

672, 676 (7th Cir. 2001).

### C. Summary Of Argument.

1. The critical issue for decertification is the number of hours worked per week. Multiple factors contribute to that figure and they vary considerably from one Sales Rep to another. Wide-ranging testimony about an individual's hours worked exists. Some Sales Reps are paid for all hours worked, others alleged they are not.

2. As a result of the above, individualized defenses to each Plaintiff's claims must be asserted.

3. Given the above, it is not possible to structure a trial whereby the testimony of one Plaintiff can be determinative of liability or damages of another Plaintiff. Indeed to do so would prejudice Wyndham's ability to fairly defend against "me too" evidence of others working OTC.

4. The most just course is to decertify the class and require individual trials on liability and damages.

### D. The Record Demonstrates The Absence Of Any Single Company-Wide Policy That Violates The FLSA.

Notwithstanding that Wyndham's written policies unequivocally require

employees to record *all* of their work time, and Wyndham's commitment to pay it,

Plaintiffs claim that an "unofficial", unwritten practice exists, forcing employees to

perform work OTC.[24] However, the exact terms and parameters of this alleged illegal practice depend on which Plaintiff describes it.[25]

The predicate of every collective action is a single alleged illegal policy or plan which impacts employees in similar ways. The emphasis is "single." *Vang v. Kohler Co.*, 488 Fed. Appx. 146, 147 (7th Cir. 2012) (vacating and remanding order certifying class "to determine whether this suit concerns **one** firm-wide policy or a congeries of supervisor-level practices" and holding that "[u]nless plaintiffs can establish a firm-wide policy, Rule 23(a)(2) prevents class certification") (emphasis added); *Lugo v. Farmer's Pride, Inc.*, 737 F. Supp. 2d 291, 310-11 (E.D. Pa. 2010) (decertifying a collective class where plaintiffs offered evidence suggesting defendant's compensation system may not have been followed as written , but failed to demonstrate any "**single** decision, policy or plan" on behalf of defendant to not compensate for compensable activities) (emphasis added).[26]

### 1. Even if a Company-Wide Unlawful Practice Were Found, it Still Must be Applied Uniformly.

---

[24] There is no allegation in this lawsuit that Wyndham's written timekeeping and overtime policies are unlawful. *See* generally ECF No. 37.

[25] This obviously makes defending a collective action unfair because Wyndham will not know in advance of trial who will describe a specific example of "unofficial" directives. Furthermore, the testimony obtained on this point in discovery alleges general assertions as managers saying, "manage your time wisely", don't record more than 40 hours per week. (*See* e.g. O'Donnell Dep. at p. 90-91, 116-117; Zautke Dep. 48).

[26] *Boelk v. AT&T Teleholdings, Inc.*, No. 12-cv-40-bbc, 2013 U.S. Dist. LEXIS 20606, at *40 (W.D. Wis. Jan. 10, 2013); *Ruiz v. Citibank, N.A.*, Nos. 10 Civ. 5950 (KPF)(RLE), 10 Civ. 7304 (KPF)(RLE), 2015 U.S. Dist. LEXIS 34489 (S.D.N.Y. Mar. 19, 2015) (finding where Plaintiffs alleged pressure to work OTC, and amassed evidence of individual violations; systemic violations, and even of violations induced by certain directors, collective action was not appropriate because the proposed class actions did not provide a common plan or scheme to subvert entirely legal policies.

Where Courts have found a single, common, unlawful plan, Courts then focus on whether the plan at issue is applied uniformly to all Plaintiffs and prospective Plaintiffs. As noted by this Court in *Boelk,* claims cannot be tried collectively when:

> [t]he plaintiffs' experiences were not common and varied depending on their individual practices and particular supervisor. Additionally, plaintiffs' own deposition testimony proves how variable their experiences were with respect to the way the [defendant's alleged unlawful policies] affected their day-to-day work activities and with respect to how other factors affected their work.

2013 U.S. Dist. LEXIS 20606, at *40-41; *see also, Viveros*, 2013 U.S. Dist. LEXIS 97997, at *13) (when the evidence establishes the claimed unlawful practice impacts employees in different ways, it is impossible to determine the liability across the class). This only makes sense because in the context of a collective action, "the claims must depend on a common contention . . . that is capable of class wide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Viveros*, 2013 U.S. Dist. LEXIS 97997, at *24 (*quoting Dukes*, 131 S. Ct. 2541, 2551 (2011)); *see also Smith*, 2015 U.S. Dist. LEXIS 43335, at *10.[27]

Plaintiffs did not receive a uniform message from supervisors directing them to work OTC. Plaintiffs cannot prove a single unlawful pay practice, and most certainly not

---

[27] *See also Brewer v. General Nutrition Corp.*, No. 11-CV-3587 YGR, 2014 U.S. Dist. LEXIS 159380 (N.D. Cal. Nov. 12, 2014) (Decertification appropriate where the inquiry of *whether and why* class members worked OTC was an individualized one even assuming the presence of incentives to work OTC); *Davenport v. Charter Communs.*, LLC, 302 F.R.D. 520, 530 (E.D. Mo. 2014) (proof that some agents were individually pressured to (and did) work OTC did not prove liability on behalf of the class as a whole).

through representative testimony, when the alleged communications ranged from express directives to unexpressed "vibes," to "coded messages", communicated to some employees but not others, by certain managers, but not all of them. (Bitner Dep. 262-63; Keegan Dep. 120; Haupt Dep. 97; Lynch Dep. 73; Schartner Dep. 68-69; Sinople Dep. 38-39, 120; Weyh Dep. 52, 134-35; Lahti Dep. 33-35; Parker Dep. 194-95, 242).

## 2. Even If An Unlawful Practice Is Found, It Impacts Sales Reps Differently, Making Collective Treatment Impractical.

However, even assuming Plaintiffs can establish a single illegal pay practice that binds the class, which they cannot, the claimed unlawful common practice impacts different employees in different ways. Assuming for the sake of argument only that the message allegedly communicated to Lynch (*i.e.,* that he should stay below 6-7 hours recorded in a day) constitutes the alleged illegal pay practice, the record demonstrates he did not always rigorously follow it. His time records establish he recorded hours in excess of this 6-7 hour directive with some regularity. (*See* Lynch Dep. Ex. 63; Duddleston Decl. ¶10). This necessarily means that he was complying with Wyndham's written, *lawful* timekeeping and overtime policies with some regularity. For example, during the time period January 5, 2013 to November 19, 2013, Lynch ignored the alleged illegal pay practice and instead followed Wyndham's lawful policy 69 ***times***. (*Id.*). *Non-compliance* with the alleged illegal practice supports decertification of OTC claims. *Espenscheid*, 705 F.3d at 773-74.

As for the directive Bitner allegedly heard, *i.e.*, that he must work OTC after lunch when conducting back-end meetings (Bitner Dep. 163-64, 262-63) there is clear evidence

this claimed directive impacted other In-House Sales Reps in different ways. For example, The directive did not impact Sales Reps Adam Karls, Greg Metzler, Max Keeling, or Larry Lynch in any respect. [ECF No. 57, ECF No. 56, ECF No. 59, ECF No. 52, confirming they recorded all time spent in back end meetings with owners and were paid for all hours worked]. Haupt claims when Dave Brown managed him he was told to record his hours after lunch, which is the exact opposite of what Bitner was told. (Haupt Dep. 97). Sinople's OTC claim is also different since he claims he was told to clock out while still working but that was not a regular occurrence, unlike Bitner. (Sinople Dep. 127).[28]

Any alleged unlawful message Schartner received impacted him in a completely different way because he admits that over the course of his employment his actual time records became more accurate and as of October 2014, his punch records are very accurate.[29] (Schartner Dep. 26-27).

As for the Disco Reps, there is the complicating threshold question of whether the alleged manager directives were even unlawful. For example, Lahti claims she was told to manage her hours to keep them under 40 per week. (Lahti Dep. 33). She admits she was never told to punch out and keep working. (Lahti Dep. 34-35). Under these

---

[28] Sinople's punch records confirm he **was** recording hours worked in the afternoon hours, which directly contradicts Bitner's claim. (Sinople Dep. Ex. 87).

[29] An analysis of Schartner's punch records for two pay periods in October 2014 show that he averaged 31.75 hours per week. (Kaitfors Decl. 3, Ex. A. As noted above, he claims his punch records were accurate at this point. This evidence further erodes Schartner's credibility, *see*, *supra*, Chart, Exhibit 1, because he admits his work hours are inconsistent with his deposition testimony of hours worked and his Interrogatory responses claiming 65 hours and 42 hours, respectively for this same period. (*Id.*).

circumstances, the alleged directive is entirely *lawful*. It is Wyndham's prerogative to manage the hours of its employees and instruct them not to exceed 40 hours in a workweek. *Beecher v. Steak N Shake Operations, Inc.,* 904 F. Supp. 2d 1289, 1298 (N.D. Ga. 2012) (holding that "the fact that Defendant generally discourages managers from allowing overtime work" is "not enough glue to hold th[e] proposed class together").

Finally, both In-House *and* Disco Reps admit they under-reported their hours and worked OTC for reasons completely unrelated to any alleged illegal pay practice. Some employees testified they did not record their time even though they were present at Wyndham's facility for the simple reason they were not working. [(ECF No. 54; (Lahti Dep. 193-194)]; [ECF No. 58, ¶12-14; ECF No. 59 ¶10; ECF No. 56, ¶11-12. Parker admits she kept her hours low, in part, to ensure eligibility for unemployment compensation benefits. (Parker Dep. 272-73); *see* also (Schartner Dep. 95-96) (field for unemployment multiple times while employed by Wyndham). Some employees managed their recorded hours because they wished to avoid Wyndham's recoverable draw pay system. In other words, some employees held the belief that the fewer hours they recorded, the less they would have to pay back to Wyndham in a future payroll cycle. (Lahti Dep. 72; Sinople Dep. 120; Weyh Dep. 134-138).

As in *Espenscheid*, where the Seventh Circuit noted that some employees underreported their time *not* because of any unlawful directive but for other "benign" reasons, decertification is appropriate. *Espenscheid*, 705 F.3d at 774.

### E. The Factual And Employment Settings Of The Individual Plaintiffs Are Varying And Individualized.

The Plaintiffs' *own* testimony proves there is no single practice binding the class. At most, alleged OTC violations were encouraged by some managers (but not others) resulting in uncompensated time for some alleged work activities (but not all of them). The record establishes a wide variation in daily work experiences of the Plaintiffs. While it is true the Plaintiffs held the jobs of either In-House or Disco Sales Reps, that is about the only thing they have in common, *i.e.*, a job title. A wide and varying range of factors impact the Plaintiffs' work days and, thus, alleged OTC hours worked. These factors matter because the overall question of liability must be capable of resolution on a class-wide basis. Here, there are so many factors which affect the hours worked in such inconsistent ways, the only fair way to discern the hours is for a jury to hear an individual's claim, one claim at a time.

> **1.** **Plaintiffs' Alleged OTC Claims Are Highly Individualized And Therefore Cannot Be Proven Through Representative Testimony**.

To state a claim under the FLSA, Plaintiffs must demonstrate Wyndham had actual or constructive knowledge of the alleged OTC work. *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 177 (7th Cir. 2011). However, the FLSA "stops short of requiring the employer to pay for work it did not know about, and had no reason to know about." *Id.*

All of Plaintiffs' claims are based upon the notion that Wyndham owes them money for work they allegedly performed OTC. [ECF No. 46]. [30] It is not enough for Plaintiffs to simply declare they all worked OTC and, thus, they are all similarly situated.

---

[30] Whether or not the claims are with merit is not the point at this decertification stage. Whether they can be proven and defended collectively is the focus.

*Espenscheid*, 705 F.3d at 774-75. Indeed, any employee's situation is similar in the broadest sense, *i.e.*, they were all employees of the company, they all worked for the company, they all worked under an alleged illegal policy. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550-2551 (2011). However, especially in a case like this, the devil is in the details. These details, confirmed by the extensive record summarized in the fact section, establish collective adjudication of Plaintiffs' claims, theories and alleged damages is not appropriate.

### a. Disparate OTC Hours And Credibility Issues.

Plaintiffs' bid to try this case collectively fails out of the gate because of the wide variation in claimed OTC hours worked as illustrated in the Credibility Chart, Exhibit 1.

The wide variability in Plaintiffs' alleged OTC hours undermines collective treatment of their claims. *Espenscheid*, 705 F.3d at 774 (employees' claims could not be proven through representative testimony because there was no uniformity concerning the employees' hours worked, including the **amount** of overtime); *Espenscheid*, 2011 U.S. Dist. LEXIS 56062, at *18-19 (wide range in hours (30-50) strongly implies one employee's experience may not be a proxy for others); *see also Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 284 (N.D. Tex. 2008) (granting decertification where time spent working OTC was not alleged to be uniform). This is so because whether or not an individual Sales Rep worked OTC or more than 40 hours in a given week will need to be decided Plaintiff by Plaintiff, week by week.

To illustrate, in *Pelczynski v. Orange Lake Country Club, Inc.*, the court denied initial certification of a collective action involving timeshare Sales Reps claiming their

employer required them to work OTC. 284 F.R.D. 364, 366 (D.S.C. 2012). Certification was denied because individualized assessments were required to resolve the purported claims, and because Plaintiffs were employed during different time periods and sought *hugely disparate* amounts of overtime. *See Id.* at 369, n.7 (emphasis added). Individualized credibility assessments were necessary because certain employees signed an acknowledgement affirming they were adequately compensated following defendant's internal audit. Specifically, the court reasoned, *"[t]hese admissions will work against the putative Plaintiffs, requiring additional evidence to overcome credibility deficiencies and may possibly lead to different defenses." Id.* at 369 (emphasis added); *see also Hudgens v. Wyndham Vacation Ownership, Inc.*, No. 5:14-cv-200-RS-EMT, 2015 U.S. Dist. LEXIS 7382 (N.D. Fla. Jan. 22, 2015) (case not appropriate for conditional certification because of the complex and varying payment schemes and because each representative would require a fact-specific inquiry into their claims to determine hours worked).[31]

The Court need not look further than the "Hours Worked Testimony" column in the Credibility Chart, Exhibit 1 to confirm that Plaintiffs' claimed hours worked are not uniform, but instead highly individualized and disparate in almost every respect. Plaintiffs' attempt to "manufacture" uniformity through their individual Interrogatory Responses, wherein each estimated (under oath) they worked the *exact same* amount of

---

[31] Other Courts agree that credibility issues matter. *Adair v. Wis. Bell, Inc.*, Case No. 08-C-280, 2008 U.S. Dist. LEXIS 68942, at *14 (E.D. Wis. Sept. 11, 2008) ("And it certainly matters whether statements made under oath in a declaration are true."); *see generally, Viveros*, 2013 U.S. Dist. LEXIS 97997, at *26;[31] *Viveros*, 2013 U.S. Dist LEXIS 135242, at *5-6 [(the Court took exception with the inconsistencies between the Plaintiffs' identical sworn declarations and their subsequent deposition testimony and found this favored individualized treatments)].

hours per week, 65 during the busy and 42 during the non-busy seasons. (Abel Dep. Ex. 47). However, those uniform "estimates" (prepared by their counsel) are inconsistent with their own deposition testimony, Declaration testimony and other admissions. This undercuts collective treatment.

Ernest Lynch's situation is illustrative. On January 14, 2013, in connection with Wyndham's site investigation, Lynch signed a Wyndham Wage and Hour Reporting Memorandum. [Lynch Dep. 69; *see* Section 11(A)]. Lynch confirmed his agreement with the following statement: **"I believe I have been paid for all hours worked and I am not owed any additional payment for time worked."** (Lynch Dep. Ex. 69). On September 13, 2013, Lynch provided Declaration testimony wherein he swore under oath:

- "Generally, **I work between 36-39 hours per week** . . ."; and
- "Since at least July 2010, I have recorded all of my hours worked in compliance with Wyndham's pay policy. **Wyndham has paid me for all hours worked since at least July 2010.**

(Lynch Dep Ex. 68) (emphasis added).

In his deposition, however Lynch testified he worked an average of 60 hours per week, every week of the year. (Lynch Dep. 128). In fact, he confirmed that for purposes of this lawsuit he should be paid for 60 hours per week. (Lynch Dep. 128). However, his interrogatory answer does an about-face when he testified he estimates he worked 42 hours per week for 25 weeks out of each year.[32] (Lynch Dep. 130-31; Abel Dep. Ex. 47).

---

[32] Lynch adopted as true the damages model created by his counsel as evidence of his claimed hours worked in response to Wyndham's Interrogatory No. 3. (Lynch Dep. 127; Dep. Ex. 65, Response to Interrogatory No. 3).

Thus, Lynch's testimony is riddled with inconsistencies and it will be necessary to unravel a web of untruths on his claim alone.[33]

Similar Plaintiff-specific credibility issues apply to the Disco Reps as well. As noted, Abel testified in his deposition he worked 40 hours per week in the busy season and 25-30 hours per week in the non-busy season. (Abel Dep. 143, 155). And he, like all the other Plaintiffs, provided interrogatory answers, under oath, wherein he stated he worked 65 hours per week in the busy season and 42 hours per week in the slow season and, therefore, he never worked less than 40 hours in a week. (*Id.*, Abel Dep. 154, Ex. 47). This contention, however, is squarely contradicted by his deposition testimony that his hours recorded are accurate until Spring of 2013 and not over 40. (Abel Dep. 108, 111, 120-21, 152-53). His contention is also contradicted by his admissions to Wyndham HR Manager Dawn Franson wherein he told Franson his time records are mostly accurate except for one particular week where he worked *less* than what he recorded. (Franson Decl. II, ¶6). Abel *never* claimed he worked 65 hours a week, in any week he worked for

---

[33] Christian Schartner's testimony also highlights the need for individualized credibility assessments. Schartner testified in his deposition that, in 2013, he worked close to 40 hours per week. (Schartner Dep. 84). He also testified he averaged 55 hours per week in the busy season and closer to 40 hours per week in the non-busy season. (Schartner Dep. 83-84). However, through his Interrogatory responses, he declared he worked 65 hours per week in the busy season and 42 hours per week in the non-busy season and thus, he never worked less than 40 hours in any week. (Schartner Dep. Ex. 74; Abel Dep. 47). Nevertheless, Schartner admits *during* his employment with Wyndham, he filed for unemployment compensation on *multiple* occasions and he received this benefit. (Schartner p. 95-98). The basis of those claims was *reduced work hours*. (*Id.*). Filing claims for unemployment on that basis is fundamentally inconsistent with his other testimony.

Wyndham. (Abel Dep. Ex. 43). The same analysis applies to Zautke (Zautke Dep. Ex. 55) and all other Plaintiffs deposed.

**b.** **Punch Times At End Of Day Vary Widely**.

Often in OTC cases the alleged illegal practice can be readily identified. For example, in donning and doffing cases, the OTC focus usually is on changing clothes/safety equipment before and after production. In these types of cases, the alleged unlawful practice can be readily identified and measured. *See*, *e.g.*, *Spoerle v. Kraft Foods Global, Inc.*, 253 F.R.D. 434, 440 (W.D. Wis. 2008). And, in such cases the question of the compensability of time is measured in minutes, not hours.

Here, however, work is not on a production line. The amount and timing of the work varies widely and so do the employee's departure times. Another way to illustrate the wide variation in hours worked is to look at punch-out times.

No two Sales Reps engage in the exact same work activities and stop those activities or stop at the exact same time. An illustrative selection of last punch-out times shows the time of day varies widely as noted in the Fact Section. This information demonstrates the absence of a discernable trend which supports the need for individualized inquires of Plaintiffs' hours of work.

**LAST PUNCH OF THE DAY**

| PLAINTIFF | 08-20-11 | 11-05-11 | 01-28-12 |
|---|---|---|---|
| **In-House Reps** | | | |
| Thomas Bitner | 11:35 a.m. | 1:00 p.m. | 10:31 a.m. |
| Abraham Haupt | 12:15 p.m. | 1:13 p.m. | 11:30 a.m. |
| Ernest Lynch | 4:53 p.m. | 6:14 p.m. | 3:06 p.m. |
| Martin Mohr | 4:42 p.m. | 3:58 p.m. | 11:42 a.m. |
| Christian Schartner | 11:42 a.m. | 12:37 p.m. | 10:00 a.m. |
| Christopher Sinople | 7:38 p.m. | 3:57 p.m. | 4:12 p.m. |
| Jason Wright | 1:00 p.m. | 2:22 p.m. | 10:45 a.m. |
| **Disco Reps** | | | |
| Stuart Abel | 3:40 p.m. | 3:56 p.m. | 12:15 p.m. |
| Elena Lahti | 6:27 p.m. | 4:38 p.m. | 7:26 p.m. |

(Bitner Dep. Ex. 19; Haupt Dep. Ex. 26; Lynch Dep. Ex. 63; Mohr Dep. Ex. 80; Schartner Dep. Ex. 72; Sinople Dep. Ex. 87; Abel Dep. Ex. 44; Lahti Dep. Ex. 98; Duddleston Decl. ¶26).

> **c.** **Whether A Sales Rep Works 4, 5 Or 6 Days A Week Affects Hours Worked, Especially Overtime**.

The Plaintiff's generally claim they work 5 or 6 days per week during the busy season. (Abel Dep. 143, 155; Parker Dep. 139-40; Weyh Dep. 84; Sinople Dep. 100-01).

In addition, the majority of Plaintiffs deposed have acknowledged that for any day (or portion thereof) they worked, a punch record in Wyntime exists. (*See* Sinople Dep. 38; Keegan Dep. 67; Schartner Dep. 19; Weyh Dep. 60). In other words, most Plaintiffs admit not working OTC for full days but rather, only portions of days for which they have punched in. (Mohr Dep. 38). It is quite unlikely a Sales Rep would actually perform work over 40 hours (let alone the 65 hour estimated identified in Interrogatory Responses) in the same week the Rep worked only three or four days. Yet, a review of four Sales Reps' punch records identify, four or fewer days worked per week ranged

from 17% to 60%.[34] (Duddleston Decl. ¶16; Mohr Dep. Ex. 80; Lahti Dep. Ex. 98; Parker Dep. Ex. 6).

This information further demonstrates the limitation of collective treatment, given yet another metric with wide variance.

> **2.** **Whether Wyndham Is Liable For OTC Work Depends On A Multitude Of "Complicating" Factors Thereby Making Collective Adjudication Untenable**.

Even assuming Plaintiffs claims were sufficiently similar to warrant collective treatment, which they are not, whether and to what extent Wyndham is liable for OTC depends on their daily individual work experiences. Plaintiffs confirmed their hours worked (and as a result alleged unpaid OTC hours) are dependent on a litany of factors, each subject to change on a daily basis.

---

[34] Time records for Rueben Gonzalez are attached to Duddleston Decl. *See* ¶16 of Duddleston Decl.

# EXAMPLES OF FACTORS AFFECTING HOURS WORKED OR WYNDHAM'S ALLEGED LIABILITY[35]

| End of Work Day | Manager Directives | Missed Punch Forms / Forged Forms | Party Weekends |
|---|---|---|---|
| (Lynch Dep. 125; Keegan Dep. 19; Schartner Dep.14; Lahti Dep. 37, 54). | (Parker Dep. 152, 194-95; Zautke Dep. 51-52; Bitner Dep. 262-63; Keegan Dep. 120). | (Zautke Dep. 53-54, 157-159; Lynch Dep. 84-89). | (Lynch Dep. 16, 90-93; Schartner Dep. 64; Keegan Dep. 121). |
| Accuracy of Time Records | Impact of Wyndham Training | Tour Times | Number and Length of Customer Meetings |
| (Schartner Dep. 23-24; Sinople Dep. 110, 113; Keegan Dep. 92; Lahti Dep. 80-81). | (Haupt Dep. 94-95; Bitner Dep. 104; Schartner Dep. 62-63, 71, 89). | (Sinople Dep. 34-35; Bitner Dep. 162; Lynch Dep. 30; Abel Dep. 35). | (Lahti Dep. 43; Zautke Dep. 56, 74). |
| Position on Power Line | Seasonal Changes | Resort Occupancy | Sales Rep Effort – Final Sale of Day |
| (Sinople Dep. 35; Parker Dep. 183). | (Lahti Dep. 152-53, 210; Zautke Dep. 122-23; Bitner Dep. 113). | (Sinople Dep. 153; Lynch Dep. 38). | (Lahti Dep. 79). |
| Variation in OTC Hours | Type & Length of Work Activity | Downtime | Weekend Meetings |
| (Sinople Dep. 52, 123; Keegan Dep. 137; Schartner Dep. 21-22). | (Lahti Dep. 166-67; Lynch Dep. 19, 116, 119). | (Parker Dep. 243-247; Lahti Dep. 66-67, 200; Schartner Dep. 78-79). | (Zautke Dep. 64; Lahti Dep. 61). |
| Customer Preferences | Different Job Responsibilities | Day of the Week | Type of Tour |
| (Weyh Dep. 33, 36; Lahti Dep. 79). | (Lynch Dep. 47-49); Lahti 196-198).[36] | (Zautke Dep. 123, 126). | (Sellers Dep. 60). |

---

[35] The examples here are for illustrative purposes. The Sales Reps testified about additional factors as those above affecting their hours worked and the fact that individual factors produced a wide range of variation in hours worked. See Exhibit 2 for more detail.

[36] Lynch worked as a deal "closer" in In-House. Lahti performed certain management functions as a Disco Rep.

Claims cannot be tried collectively when the Plaintiffs' own testimony establishes many different factors and individual circumstances impact their work day, and thus, hours worked. *Boelk*, 2013 U.S. Dist. LEXIS 20606, at *40-41. When employee-specific inquiries are necessary to resolve fundamental issues in the case, *i.e.*, Wyndham's alleged liability for OTC work, then representative testimony will not suffice. *See Espenscheid*, 705 F.3d at 773-74.

For example, in *Espenscheid*, there were too many "complicating factors" undermining the conclusion that one employee's testimony is representative of that of another, including: varying quantity of work at issue; variability in how employees recorded their time; varying manager directives concerning what time they should or should not report; and the wide range of time it took employees to perform certain tasks. *Espenscheid*, 2011 U.S. Dist. LEXIS 56062, at *19-20. "Given the wide variability and inconsistencies in [employee] testimony, it would be difficult for a jury to determine what experiences are representative of the entire group of [employees] at issue in this case without gross margins of error." *Id.* at *20.[37]

As a result of Plaintiffs' testimony, it is undisputed a multitude of factors affect Plaintiffs' hours worked. Additional unpredictability occurs within each day. *See* Schartner Dep. 14 (describing In-House, "we never really knew, walking in [to work], how many hours we were going to be working."); Lahti Dep. 37, 54 (describing Disco,

---

[37] *See also Blakes v. Ill. Bell Tel. Co.*, 2013 U.S. Dist. LEXIS 176496, *61 (N.D. Ill. Dec. 17, 2013) (decertification was appropriate because no plaintiff could give truly representative testimony regarding the collective habits of other employees, and a fact-finder would need to "pick the class apart, plaintiff by plaintiff," and make assessments of the day-to-day job duties of each of the plaintiffs to prove their defenses."

"[t]here were always variances in the day as to how many guests we would see, when we would see someone, what time we would be able to eat lunch, if we got to eat lunch, when we would be finished . . . [A]ll of my clock-in, clock-out hours varied week to week.").

Variation in hours worked results from the interplay of the factors in the chart above. These variables impact the Plaintiffs in different ways, as confirmed by their own testimony.[38] Resolution of all of these issues through representative testimony is a non-starter.

### 3. Damages Cannot Be Proven Through Representative Testimony.

Another reason decertification is appropriate relates to the highly individualized nature of how liability and damages will be calculated. On one surface, Plaintiffs all claim to work 65 hours per week in the busy season and 42 hours per week in the slow season. (Abel Dep. Ex. 47). While case law, including *Brown v. Family Dollar Stores of Ind., LP,* (citing *Anderson v. Mt. Clemens*, 328 U.S. 680 (1946)); allows Plaintiffs to make **reasonable inferences** as to the hours of work performed when an employer's records are inaccurate, relevant legal authority **does not** permit Plaintiffs to determine damages on a representative basis based on generalized estimates of time worked without being subjected to cross-examination, given prior inconsistent testimony. 534 F.3d 593, 596-97 (7th Cir. 2008); (*Espenscheid*, 705 F.3d at 774; *Espenscheid*, 2011 U.S. Dist. LEXIS 56062, *18-19.

---

[38] And, finally, to complicate matters further, Plaintiffs' testimony concerning these factors is inconsistent and conflicting.

Putting aside the difficulties associated with Plaintiffs average estimates of time worked, the damage calculations in this case would be *highly* individualized depending on the commissions, and bonuses available for the specific Sales Rep during a specific time period. Payroll Manager Jeanie Willis' deposition testimony, as well as her previously filed declaration, demonstrates the individualized nature of the proof required to show liability and potential damages, considering the impact of a contract rescission on overtime. [ECF No. 61]. The Willis Declaration also shows that the actual compensation earned and the corresponding entitlement to overtime compensation are driven by the hours worked in a given week and the types of compensation components that are complicated and interconnected.

The Willis Declaration shows just one example of how overtime is calculated for one Sales Rep on one occasion. Certifying a collective action under these circumstances will still necessitate 27 mini-trials to determine both liability and damages on each of opt-ins' claims, which is not economical. (*See*, e.g. Model Jury Instruction for 8th Cir., Sec. 10.44). This liability and damage claim would need to be calculated for each Sales Rep alone. Treating the Sales Rep as a single group is unworkable especially in light of *Walmart Stores Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) and *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013).[39] *See also Franks v. MKM Oil*, No. 10 CV 00013, 2012 U.S.

---

[39] In *Behrend*, the Supreme Court held that lower Courts must not only assess how Plaintiffs propose to establish liability but also how Plaintiffs propose to decide damages on a class-wide basis. 133 S. Ct. at 521-522. In *Dukes*, the Supreme Court stated "[w]hat matters to class certification . . . is not the raising of common questions-even in droves-but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. (emphasis in original) (citation omitted).

Dist. LEXIS 128205, at *32 (N.D. Ill. 2012) (denying conditional certification - determining the specific amount paid to each employee would require a highly individualized, employee-by-employee analysis); *Wallace v. Norcross Assocs., LLC,* Civil Action No. 1:13-cv-1349-RWS, 2014 U.S. Dist. LEXIS 48110, at *9-10 (noting the difficulty of calculating commissions because "each person paid by commission would have earned at a different rate depending on their sales").

### E. The Individualized Nature Of Wyndham's Defenses Precludes Collective Treatment Of Plaintiffs' Claims.

In determining whether to decertify a collective action, Courts "consider whether defendants' defenses could be applied across the board to plaintiffs' claims . . . or whether many and perhaps disparate defenses could be raised." *Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 352 (N.D. Ill. 2012) (internal quotations omitted). Given the wide variations in Plaintiffs' claims as noted above, Wyndham's defenses will not be applied across the board and will likewise require individualized assessments.

#### 1. "Downtime" Is Sometimes Compensable And Sometimes Not; It Depends On The Circumstances.

For example, depending on the factual circumstances, downtime may or may not constitute working time under the FLSA. *Dinges v. Sacred Heart St. Mary's Hosps.*,

---

Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." (emphasis in original) (citation omitted). Although *Dukes* involved a Rule 23 Class and not and FLSA class, the commonality requirement under Rule 23 is analogous to the FLSA's similarly situated requirement and Courts in the Western District are increasingly relying upon the reasoning in *Dukes* in FLSA cases. *See e.g., Viveros v. VPP Group, LLC*, 2013 U.S. Dist. LEXIS 97997 (W.D. Wis. July 15, 2013).

164 F.3d 1056, 1058 (7th Cir. 1998). The relevant question regarding compensability of activities performed during downtime is whether the time is spent predominately for the employer's benefit or for the employee's. *Cleary v. ADM Milling Co.*, 827 F. Supp 472, 475 (N.D. Ill. 1993). As the Court in *Mireles v. Frio Foods, Inc.*, explained "whether an employee is entitled [to] pay for time spent waiting depends, in large part, on the manner in which the [down]time is spent". 899 F.2d 1407, at *6 (5th Cir. 1990).[40]

As applied, Wyndham's liability for OTC may depend on:

- when and whether each plaintiff engaged in downtime;
- the nature of the activities performed during downtime periods;
- the amount of downtime; and
- whether each plaintiff was compensated for activities performed during downtime periods.

As detailed above, all of these factors vary significantly depending on the factual and employment circumstances of each Plaintiff.

The following are some examples in the record of reasons Sales Reps might stay or leave the sales area during down time:

1. Sales Reps might take a meal break (Sinople Dep. 146-48);
2. Sales Reps might have a long wait between a recently completed tour and the next tour (Lahti Dep. 61-62);
3. Sales Reps may wish to stay near the sales area so they don't miss a sales opportunity (Lahti Dep. 38, 62-63, 72-74);
4. Sales Reps might not be engaged in work related activity even though they might physically be present at their work area (Bitner Dep. 145-46);

---

[40] *See also Dinges*, 164 F.3d at 1058 ("[T]ime is not 'work' if it can be used effectively for personal pursuits."). If the employee spends downtime predominately for the benefit of the employer, the employee is "engaged to be waiting" and is entitled to compensation. *Id.* On the other hand, if the time primarily benefits the employee, the employee is "waiting to be engaged" and is entitled to compensation only for that time spent in productive work. *Id.*

5. Sales Reps may or may not have been told to punch out and keep working (Lahti Dep. 34-35; Zautke Dep. 51); and

6. Some Sales Reps thought they could earn more money if they worked OTC (because they would not have to pay back minimum wage they receive) (Zautke Dep. 51-52).

These examples indicate the question of whether downtime and/or OTC is or is not compensable is highly individual. The testimony in the record illustrated above makes clear that not all OTC claims are based on compensable activity.

### 2. Compensation For Non-Work Time May Off-Set Uncompensated OTC Work Time.

Another Wyndham defense relates to the legal principle that paid time for otherwise non-compensable work time can be set-off against any potential compensable time spent on OTC work. *See Barefield v. Vill. of Winnetka*, 81 F.3d 704, 711 (7th Cir. 1996) (the employer may offset unpaid work time against paid non work time of the paid meal period); *see also Smith v. Safety-Kleen Sys. Inc.*, No.: 10 C 6574, 2012 U.S. Dist. LEXIS 5908, at *16 (N.D. Ill. Jan. 18, 2012) ("Paid meal breaks may offset unpaid time if the meal times are not work").

Here, the record establishes some employees were not clocking their precise hours of work but rather "averaging their time" due to downtime that existed during their workday. (Franson Dep. Ex. 6). As a result of "averaging," employees were sometimes on-the-clock (and therefore paid) when engaging in non work-related activities. (*See* Franson Dep. Ex. 6; Mohr Dep. 33-38, 76-77); (Zautke Dep. 164-65, 177-78) (explaining non work-related tasks she performed when waiting for her next tour); (Abel Dep. 167-68) (admitting he was paid for time spent waiting for his next

tour to start and explaining "in discovery you're on the clock no matter when you punch in till the time you leave because you never know when the next tour is coming . . .").

Specifically, Mohr testified he engaged in non work-related tasks such as socializing with coworkers and buying and drinking coffee while on-the-clock. (Mohr Dep. 35, 37). Mohr's testimony confirms these periods of downtime could last 30 minutes or more. (*Id*.). Additionally, according to Mohr, Wyndham did not require Sales Reps to punch out during these periods of downtime unless the employee left Wyndham's facility. (Mohr Dep. 76-77).

Whether, and the amount of time, each Plaintiff may have been paid for non-compensable work time during the workday will be different for each Plaintiff and would act as a set off against OTC work. Any set-off for downtime is not capable of collective treatment because the set-off applicable to Mohr, for example, cannot be used to make the same determination for Bitner (who claims he did not have much downtime) or Schartner (who was often OTC when he had downtime). (Bitner Dep. 164-65, 171; Schartner Dep. 79). The set-off defense as applied to the facts of this case varies based on the factual and employment circumstances of the individual Plaintiffs.

### 3. What Managers Knew or Should Have Known About OTC Work Varies.

The FLSA does not require employers to "pay for work it did not know about and had no reason to know about." *Kellar*, 664 F.3d. at 177. Whether a particular

manager knew or should have known a Sales Rep performed work OTC is highly individualized. At trial, Wyndham will highlight the considerable amounts of downtime Plaintiffs regularly experience in a workday and the lack of a consistent work schedule in arguing its managers did not have actual knowledge of each Plaintiff's claimed OTC work. Wyndham will also point to these highly variable factors in arguing it is not reasonable to conclude managers should have known of each Plaintiff's OTC work.

In asserting this individualized liability defense, Wyndham will need to examine, Plaintiff by Plaintiff, the nature of the activities performed during each work day (including during downtime periods) and the Plaintiff's manager's understanding of whether the Plaintiff was on the clock when such activities were performed. Since this inquiry must be done for each individual Plaintiff, decertification is appropriate. *See also Hart*, 2012 U.S. Dist. LEXIS 175983, at *16-17 (M.D. Fla. Dec. 12, 2012) ("plaintiff-specific inquiries would be required as to numerous issues including, inter alia, whether Plaintiffs actually worked 'off-the-clock,' whether Plaintiffs modified their time records to reflect the actual time worked, whether Plaintiffs' supervisors where aware of any 'off-the-clock' work . . . "[41]

---

[41] *Hudgens v. Wyndham Vacation Ownership, Inc.*, No. 5:14-cv-200-RS-EMT, 2015 U.S. Dist. LEXIS 7382, (N.D. Fla. Jan. 22, 2015) (case not appropriate for conditional certification because of the complex and varying payment schemes and because each representative would require a fact specific inquiry into their claims to determine hours worked); *Strickland v. Wyndham Vacation Resorts, Inc.*, Case No. 6:13-1000-Orl-28GJK, at n.24 (M.D. Fla May 8, 2014) ("substantial questions of fact regarding whether the current opt-in plaintiffs clocked out between tours on a regular basis or even at

The court also noted that "collective treatment is not appropriate where a defendant would be required to 'pick the class apart, plaintiff by plaintiff, going into the day-to-day job duties of each of the plaintiffs to prove' their defenses." (*Id.*).

### 4. What Manager Told Sales Reps About OTC Work Varies.

Another individualized defense is what supervisors told Sales Reps. For example, former manager Delmore said his supervisor Kyle Mays ("Mays") instructed Sales Reps to work OTC. [ECF No. 42]. Mays was deposed and denied saying this. (Mays Dep. 163-64). In contrast, former manager, Casey O'Donnell testified he was never told by his supervisor, Brandon Borelli, to instruct his Sales Reps to work OTC. ("O'Donnell Dep. 120-22) Instead, O'Donnell simply asserted an "unspoken" practice of doing this. (O'Donnell Dep. 90-91, 116-17). As is evident from these two examples, what one manager may have said to his/her Sales Reps may not be the same as what another manager said.

Wyndham has the right to assert individualized defenses to each claimed statements made by managers, based on the evidence and each manager's credibility. *See Martin v. Citizens Fin. Grp., Inc.*, No. 10-260, 2013 U.S. Dist. LEXIS 43084, at *21-22 (individualized defenses raise concerns about the practical implications of resolving credibility disputes). The court in *Espenscheid* held that the employer's defenses could not be adjudicated collectively because certain defenses went to the credibility of

---

all…supports the conclusion that these claims are too individualized to warrant collective action certification.").

testimony and claims making cross examination key. 2011 U.S. Dist. LEXIS 56062, at *20-21.

**F.     Procedural And Fairness Considerations Militate Against The Maintenance Of A Collective Action**.

The third factor the Court considers is whether proceeding as a collective action provides fairness and procedural benefits. A myriad of individualized factual issues weighs against collective treatment; *Strait v. Belcon Eng'g Group, Inc.,* 911 F. Supp 2d 709, 731-32 (N.D. Ill. 2012) (citing to *White v. Baptist Mem'l Health Care Corp.*, No. 08-2478, 2011 U.S. Dist. LEXIS 52929, at *14 (W.D. Ten. May 17, 2011) ("Because [the plaintiff] has not shown that the Opt-In Plaintiffs are similarly situated . . . , there is no judicial economy to be gained by allowing their claims to proceed collectively. The only possible results are unfairness to [the defendant] and manageability problems for the Court."); *See also Marshall*, 2012 U.S. Dist. LEXIS 161768, at *27-28 ("the absence of a . . . specific job duty done "off-the-clock" . . . necessitates the particularized liability analysis which defeats the judicial economy associated with a collective action).

Resolution of OTC claims based upon different activities—some may be compensable as work while other may not be—in the absence of a clear company practice does not lend itself to efficient or cost-saving adjudication.

The third factor courts consider also favors decertification.

**IV.     CONCLUSION.**

The only single policy which applies to Plaintiffs and the putative class is that

Wyndham requires all hourly employees to record all work time and to be compensated for all hours worked. Plaintiffs own testimony forecloses their ability to meet their burden of proving otherwise. The 27 former employees do not form a cohesive group by themselves, much less between themselves:

- All Plaintiffs deposed provided false sworn testimony about their hours worked;
- 5 of 14 deposed Plaintiffs swore to the Wisconsin Unemployment Insurance Division they worked reduced hours during their employment in order to receive benefits;
- 7 of 14 deposed Plaintiffs acknowledged; in writing being paid for all hours worked and Wyndham did not owe them additional compensation; and
- All Plaintiffs leave work at different times each day and, as a result, hours worked are never the same for any two or more Sales Reps.

The only "glue" holding 27 plaintiffs together is their highly superficial claim that they all performed work OTC. The overwhelming authority cited herein confirms such contention is not enough to adjudicate these claims collectively.

As the Court dives into the details (as it must at this stage) the Plaintiffs' own testimony and this robust record shout out against collective treatment. Most importantly, the individual inquires, regarding both liability and damages would massively overwhelm any purported common issues of fact or law, which Plaintiffs have come nowhere close to proving. The Plaintiffs here are not factory workers with uniform workdays nor were they exposed to a uniform illegal practice. It is an overwhelming effort to re-create a Sales Rep's work day and determine whether OTC work occurred at all, and, if so, how much and why.

Each day in the life of a Sales Rep differs depending on numerous variables such as their department, manager, season, day of the week, place in the tour rotation, tour

times, type of tour, staffing levels, resort occupancy, and whether they made a sale, among other factors. Neither party can re-create the work days of 27 sales employees without dozens of witnesses and thousands of documents. Allowing this case to proceed collectively results in a case impossible to manage, arduous to try and which would deprive Wyndham of its ability to fairly defend against these claims.

Dated:  May 19, 2015.                    JACKSON LEWIS P.C.


                                         *s/ David J. Duddleston*
                                         David J. Duddleston #1044406
                                         Brian T. Benkstein, *pro hac vice*
                                         Nora R. Kaitfors #1080466
                                         225 South Sixth Street, Suite 3850
                                         Minneapolis, MN  55402
                                         (612) 341-8131

                                         ATTORNEYS FOR DEFENDANT


4828-2829-2132, v. 4