IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

THOMAS BITNER and TOSHIA PARKER,
individually and on behalf of those similarly
situated,

                        Plaintiffs,                    OPINION AND ORDER

        v.
                                                        13-cv-451-wmc

WYNDHAM VACATION RESORTS, INC.,

                        Defendant.

In this civil action, plaintiffs Thomas Bitner and Toshia Parker assert claims on behalf of themselves and a putative class of employees of Wyndham Vacation Resorts, Inc. ("Wyndham"), under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and applicable Wisconsin wage and hour laws. The named plaintiffs are sales representatives at Wyndham's only Wisconsin facility, located near the Wisconsin Dells, who allege that managers and supervisors maintained an unofficial policy that required them to perform unpaid, off-the-clock work. In a prior order, the court conditionally certified collective actions of current and former "In-House Sales Representatives" and "Discovery Sales Representatives" at Wyndham's Wisconsin Dells location under 29 U.S.C. § 216(b). (Dkt. #92.) Before the court now are plaintiffs' motion to certify a Rule 23(b)(3) class of all In-House Sales Representatives who worked at Wyndham's Wisconsin Dells office at any time between June 25, 2011, and the date that Wyndham converted its in-house department to a "blended line" in the fall of 2014. (Dkt. #163.) Also before the court are defendant's motion to decertify the two conditionally certified

FLSA classes (dkt. #157), plaintiffs' motion for partial summary judgment (dkt. #204), defendant's motion for partial summary judgment (dkt. #214), and defendant's motion to dismiss four opt-in plaintiffs who have not responded to defendant's discovery requests (dkt. #246).

For the reasons that follow, the court will grant plaintiff's motion to certify a class action, finding the requirements of Rule 23 satisfied. For largely similar reasons, the court will deny defendant's motion to decertify the two conditionally certified FLSA collective actions. The court will also deny the parties' cross-motions for partial summary judgment, finding factual disputes that necessitate a trial. Finally, the court will grant defendant's unopposed motion to dismiss four opt-in plaintiffs who have failed to respond to discovery requests and noticed depositions. Accordingly, the claims of those four individuals will be dismissed without prejudice.

## UNDISPUTED FACTS[1]

### A.   Parties

Defendant Wyndham Vacation Resorts, Inc., is in the business of marketing and selling vacation ownership interests. At its Wisconsin Dells location, Wyndham divides "Sales Representatives" into three departments that share the same general responsibilities but have different specific duties. For purposes of this case, "Front Line Sales Representatives" are responsible for selling ownership interests to new prospects. "In-House Sales Representatives" meet with existing timeshare owners in a "tour" or

---

[1] The court derives the following facts from the parties' submissions, noting where the parties have identified a factual dispute.

"front-end meeting," with the goal of convincing the owner to attend a second "back-end meeting," or "continuance," where the owner is presented with opportunities to upgrade his or her ownership interest. "Discovery Sales Representatives," on the other hand, attempt to sell vacation packages to potential buyers after they have decided not to purchase a package or upgrade from a Front Line or In-House Sales Representative.[2]

Named plaintiff Thomas Bitner was an In-House Sales Representative and a Front Line Sales Representative at Wyndham's Wisconsin Dells location, and Toshia Parker was a Discovery Sales Representative. At least initially, including the named plaintiffs, the conditionally certified FLSA class of In-House Sales Representatives consists of twenty-three opt-in plaintiffs, and the class of Discovery Sales Representatives totals eight.[3] There are 109 members of the putative Rule 23 class of In-House Sales Representatives. (Decl. of David C. Zoeller (dkt. #172) ¶ 7.)

### B.   Wyndham's official Wyntime timekeeping system and payment policies

At all times relevant to this lawsuit, Wyndham classified all Sales Representatives as non-exempt from federal and state overtime and minimum wage requirements. Both In-House Sales Representatives and Discovery Sales Representatives earn an hourly minimum wage draw, commissions and bonuses. Sales Representatives who work together to initiate and close a sale earn split commissions. A Sales Representative's

---

[2] Aside from their role in pitching potential buyers before Discovery Sales Representatives have an opportunity to sell vacation packages, the precise responsibilities of Front Line Sales Representatives are not relevant to the instant motions because plaintiffs have dismissed their class claims with respect to the Front Line Sales Representatives.

[3] That number will obviously be reduced by the court's order granting defendant's motion to dismiss four of the opt-in plaintiffs.

future commissions are paid out from a balance of hourly draw payments earned, which accumulate indefinitely until he or she stops working or earns enough in commissions to pay down the balance. Sales Representatives who work more than 40 hours in a particular week earn overtime on their regular rate of pay, which is calculated separately based on the amount of draw pay, commissions or bonuses received.

Sales Representatives keep track of their own hours in Wyndham's "Wyntime" electronic timekeeping system. Wyndham's written policies on timekeeping and payments are incorporated in its employee handbook and are a subject for training of newly hired Sales Representatives. Among other things, the 2011 employee handbook requires Sales Representatives to: (1) be clocked in while working and clocked out during meal breaks or other periods of "non-work"; (2) notify a manager about any work done off-site; and (3) get overtime pre-approved by a manager. (Decl. of Nora R. Kaitfors, Ex. B (dkt. #63-2).) The written policies also require Sales Representatives to notify their manager in writing when they "miss a punch," whether by failing to clock in or to clock out.

Managers are responsible for monitoring the hours and time records of the Sales Representatives they supervise. (*See* 30(b)(6) Dep. of Laura L. Klouw (dkt. #145) 48:9-14.) Wyndham also holds managers accountable for the sales results achieved by their Sales Representatives. (30(b)(6) Dep. of Eric L. Sellers (dkt. #146) 62:22-63:11.)

## C.   Plaintiffs' allegations of off-the-clock work

Despite Wyndham's written policies prohibiting Sales Representatives from performing unpaid work off-the-clock, plaintiffs allege that managers and supervisors at

the Wisconsin Dells location maintained an unofficial policy of *requiring* off-the-clock work.

###### i.   In-House Sales Representatives

During depositions, the opt-in, In-House Sales Representatives identified several different ways in which managers required them to work off-the-clock.  Some understood general directions to "manage" their time or avoid working more than 40 hours in a week to be thinly veiled orders to work off-the-clock.  (Dep. of Christian L. Schartner (dkt. #154) a70:8-15; Dep. of Christopher F. Sinople (dkt. #155) 89:21-23.)  Others testified that managers commanded them to punch out when they neared 40 hours in a week. (Dep. of Margaret L. Zautke (dkt. #137) 137:2-6; Dep. of Justin R. Keegan (dkt. #139) 122:4-12; Dep. of Nathan G. Weyh (dkt. #141) 105:3-25; Dep. of Martin G. Mohr (dkt. #153) 73:15-16; Dep. of Sean D. Sweeney (dkt. #156) 128:16-21.)

Plaintiffs further allege that managers carried out this unofficial, off-the-clock work policy by prohibiting them from being clocked in during certain times of the day or when performing certain work responsibilities.  (Dep. of Abraham Haupt (dkt. #29) 98:4-22 (recalling four managers who told him to clock out after morning tours or at lunch and not clock in for the rest of the day); Dep. of Ernest B. Lynch (dkt. #138) 72:12-19 (managers declared during morning meetings that "if you're not setting up a continuance or doing a back end, you should be off the clock"); Dep. of Justin R. Keegan (dkt. #139) 22:24-23:23 (told to punch out between waves of tours despite attending "hoorah meetings" or training meetings); Dep. of Nathan G. Weyh (dkt. #141) 51:9-13 (stating that manager Christine Kwitek told him, "[y]ou're only on clock while you're

5

with a customer"); Dep. of Casey O'Donnell (dkt. #142) 58:5-13 (recalling being told both as a manager and as an In-House Sales Representative that In-House Representatives should clock in while on a tour, clock out after a tour has ended and not clock back in until on another tour or in a continuance); Dep. of Martin G. Mohr (dkt. #153) 106:21-25 (managers told him "punch out after lunch and don't punch back in"); Dep. of Christian L. Schartner (dkt. #154) 22:8-10 (managers "were pushing us to punch out and be off the clock by right after that morning tour round; that was the norm and that's what we did"); Dep. of Margaret L. Zautke (dkt. #137) 137:11-20 (managers told her "hey, go punch out, you're getting high on your hours" when another Sales Representative was conducting a back end meeting for one of her customers, but then, if the customer ultimately decided to make a purchase, punch back in while they signed contracts).)

Several In-House Sales Representatives recall being ordered to conduct back-end meetings while clocked out or being pulled out of back-end meetings and told to punch out.  (Dep. of Thomas Bitner (dkt. #27) at 263:1-4; Dep. of Justin R. Keegan (dkt. #139) 53:3-15; Dep. of Ernest B. Lynch (dkt. #138) 73:7-25; Dep. of Sean D. Sweeney (dkt. #156) 116:20-25.)  In addition, several In-House Sales Representatives testified at their depositions that they routinely worked off-the clock by taking calls from customers, even when they called after hours. (Dep. of Ernest B. Lynch (dkt. #138) 19:2-3; Dep. of Casey O'Donnell (dkt. #142) 61:20-23.)

In addition, some plaintiffs testified that *managers* themselves would independently clock out In-House Sales Representatives when they approached 40 hours

or ordered In-House Sales Representatives to clock their team members out.  (Dep. of Nathan G. Weyh (dkt. #141) 105:11-25; Dep. of Christian L. Schartner (dkt. #154) 70:8-15.)   At times, according to another plaintiff, managers told In-House Sales Representatives to sign a missed punch form to reduce arbitrarily the number of hours worked below 40.  (Dep. of Margaret L. Zautke (dkt. #137) 54:14-24.)

Two of the opt-in plaintiffs who worked as In-House Sales Managers further testified that In-House Sales Directors, their immediate supervisors, were aware of and condoned off-the-clock work by In-House Sales Representatives.  Thomas Delmore also asserts that he ordered his team to work off-the-clock to avoid overtime at the direction of In-House Sales Director Kyle Mays.  (Decl. of Thomas Delmore (dkt. #42) ¶ 6.) Similarly, In-House Sales Manager Casey O'Donnell testified at his deposition that In-House Sales Director Brandon Borelli instructed him and the other In-House Managers to "do whatever [they] need[ed] to do" to have In-House Sales Representatives make sales without reporting more than 40 hours worked, which he understood to be encouraging off-the-clock work by In-House Sales Representatives.   (Dep. of Casey O'Donnell (dkt. #142) 90:5-91:7.)

### ii.    Discovery Sales Representatives

The plaintiffs who worked as Discovery Sales Representatives provided similar testimony regarding the alleged unofficial off-the-clock policy.   One Discovery Sales Representatives inferred from statements made by managers that they were expected to work off-the-clock.  (Dep. of Margaret L. Zautke (dkt. #137) 51:16-24 (explaining that she understood manager Mike Wilder's directive to "manage [her] hours wisely" as code

7

for an order to work all of her scheduled hours but not record more than 40).)  Another recalled more express threats.  (Dep. of Elena K.D. Lahti (dkt. #140) 33:6-21 (after recording 42 hours for her first week because she stayed clocked in while on the sales floor, Lahti was told that she would be punished the next time she recorded more than 40 hours).)  Yet another Discovery Sales Representative asserts managers Mike Wilder and Lance Tinsley specifically told him to punch out but "get the job done" when he approached 40 hours.  (Dep. of Stuart W. Abel (dkt. #136) 107:13-23.)  According to a different Discovery Sales Representative, managers' expectation for Discovery Sales Representatives to clock out for a certain amount of time for lunch each day caused them to work off-the-clock, which was facilitated by managers falsifying missed punch forms. (Dep. of Toshia Parker (dkt. #28) 152:14-25, 155:14-25.)

###    D.    Payment Gateway System

Wyndham uses a system called "Payment Gateway" to keep records and process down payments customers make during a second, back-end meeting with In-House Sales Representatives.  Payment Gateway creates a nearly contemporaneous time stamp when that payment is processed.  (30(b)(6) Dep. of Jamie Supsinskas (dkt. #150) at 42:17-24, 44:14-21.)  The most common means of payment -- by credit card and "Bill Me Later" payments[4] -- are typically processed in the Payment Gateway System while Sales Representatives are still present with a customer.  (*Id.* at 33:19-25, 45-12:18.)

---

[4] Wyndham's Director of Operations Jamie Supsinskas explained that Bill Me Later is equivalent to PayPal, allowing customers to make a down payment using an online account.  (30(b)(6) Dep. of Jamie Supsinskas (dkt. #150) 29:11-24.)

By comparing Payment Gateway data to Wyntime data, therefore, plaintiffs were able to calculate the percentage of times that "time-stamp events in the Payment Gateway system" were recorded while a Sales Representative was not clocked into Wyntime.  (Decl. of Alexander Wise (dkt. #165); Decl. of Alexander Wise (dkt. #182); Rev. Decl. of Alexander Wise (dkt. #191); Rev. Decl. of Alexander Wise (dkt. #192-1).) Based on the data provided for the seventeen opt-in, In-House Sales Representatives, plaintiffs calculated they were off-the-clock 55.74% of the time when Payment Gateway created a timestamp.  (Decl. of Alexander Wise (dkt. #191) ¶ 9.)  Similarly, plaintiffs calculated that the three Discovery Sales Representatives for whom defendant provided data were off-the-clock around 21.09% of the time.[5]  (Rev. Decl. of Alexander Wise (dkt. #192-1) ¶ 9.)  Defendant contends that plaintiffs' calculations are of limited relevance because Sales Representatives close sales only about a tenth of the time.  Nonetheless, this data would suggest that more than half of the closings involving In-House Sales Representatives and approximately one-fifth of those involving Discovery Sales Representatives occurred off-the-clock.[6]

E.   **Wyndham's internal investigation**

In fall of 2012, opt-in plaintiffs Abe Haupt and Martin Mohr separately informed human resources manager Dawn Franson that their time records were inaccurate after

---

[5] Plaintiffs attempt to account for instances when more than one Sales Representative sold to a customer by calculating separately when a Payment Gateway entry is marked "Y" in the "Split Flag" column, although it appears not all entries are marked either "Y" or "N."  (*See* Decl. of Alexander Wise, Ex. A (dkt. #192-1).)

[6] There may well be other flaws in plaintiffs' analysis, but most (if not all) would appear to go to its weight rather than its admissibility.

being denied medical leave under Wyndham's Family Medical Leave Act policy because they had not worked enough hours for eligibility. This prompted Franson to inquire further. By the conclusion of her investigation in January of 2013, Franson had interviewed a total of twenty-two sales representatives and six managers. (Def.'s Opening Br. (dkt. #167) 5.) Franson's investigation resulted in numerous sales representatives reporting that they were not properly recording their time, in part due to the instruction or encouragement of managers. (Pl.'s Opening Br. (dkt. #164) 21-22 (citing Decl. of David C. Zoeller Ex. E (dkt. #172-6)).)[7] Additionally, Laura Klouw, Franson's supervisor, discovered several instances of Sales Representatives apparently working off-the-clock by comparing time clock records to tour records, although Klouw questions the accuracy of those tour records. (*Id.* at 22 (citing Dep. of Laura L. Klouw (dkt. #145) 68-71).)

As a result of Wyndham's investigation, the company disciplined multiple managers and supervisors at the Wisconsin Dells office. In particular, managers Christine Kwitek, Dave Brown and Lance Tinsley received corrective actions because Wyndham determined that they were not appropriately ensuring that the time records of their In-House Sales Representatives were accurate. (30(b)(6) Dep. of Barbara Masticola (dkt. #151) 90:9-91:7.) In addition, Kyle Mays, the In-House Sales Director and immediate supervisor of the disciplined managers, was demoted and transferred to

---

[7] Though plaintiff cites a set of handwritten, excerpted investigation notes as the source from which this information is drawn, the court could not confirm it in the record provided. The same information is, however, found in a separate document in the record. (Decl. of Caitlyn M. Madden (dkt. #117-6) 5.)

another Wyndham location in part because the company determined that he was "lackadaisical" toward its timekeeping policies. (Dep. of Dawn Franson (dkt. #144) 45:4-10.)

In connection with the investigation, Wyndham also implemented mandatory training on its timekeeping policies for sales representatives and their managers in early 2013. Wyndham further extended Sales Representatives the opportunity to claim payment owed for off-the-clock work. While only one Sales Representative actually claimed unpaid work, 44 others signed a wage and hour memorandum prepared by Wyndham confirming payment for all hours worked.[8] (Def.'s Opening Br. (dkt. #167) 5-6.) The 44 who signed the memorandum include at least seven of the fourteen opt-in plaintiffs who sat for a deposition in this case. (*Id.*)

One In-House Sales Representative who signed the memorandum, however, suggests that the Sales Representatives were "pretty much coerced into" signing it. (Dep. of Christian L. Schartner (dkt. #154) 23:11-16; 50:22-51:5 (further explaining that he took seriously In-House Sales Director Don Tansor's comment, "sign this if you want to keep working here" despite acknowledging that he made it at least somewhat in jest); *see also* Dep. of Nathan G. Weyh (dkt. #141) 162:7-20 (responding, "I wanted to keep my job" to explain why he initialed the statement confirming that he had been paid for all hours worked).) Several Sales Representatives also claim that off-the-clock work

---

[8] Specifically, the memorandum includes space for each employee to initial next to the statement "I believe that I have been paid for all hours worked and I am not owed any additional payment for time worked" and sign their name at the bottom of the form. (Decl. of Dawn Franson Ex. A (dkt. #159-1).)

11

continued despite Wyndham's efforts to improve timekeeping practices.[9]   (Dep. of Margaret L. Zautke (dkt. #137) 91:12-92:22 (managers, including Mike Wilder, said, "back to business, same as normal" and warned, "make sure you don't get caught working off-the-clock" immediately after a meeting in January of 2013 at which human resources manager Dawn Franson explained how to properly record hours worked); Dep. of Ernest B. Lynch (dkt. #138) 69:19-70:1 (continued to work off-the-clock at manager's direction); Dep. of Justin R. Keegan (dkt. #139) 80:3-11 (managers continued to tell him to punch out and work off-the-clock); Dep. of Nathan G. Weyh (dkt. #141) 68:4-69:2 (continued to work off-the-clock); Dep. of Christian L. Schartner (dkt. #154) at 53:1-10 (working off-the-clock continued post-training based on "management's reaction").)

### F.   Variable daily job experiences

Although individual In-House Sales Representatives and Discovery Sales Representatives generally shared the same responsibilities, their daily experiences varied widely depending on a number of different factors.  For example, factors affecting Sales Representatives' daily start and end times included:  how many customers he or she had the opportunity to meet; how long meetings with owners took; and where the Sales Representative was located on the "power line," which determined the order in which sales opportunities became available.   Defendant explains that, among others, these

---

[9] Months after the conclusion of its investigation, Wyndham disciplined two, additional managers at the Wisconsin Dells office for improper timekeeping practices: Steve Cross in August 2013 for altering time records without his employees' approval (dkt. #183); and Casey O'Donnell in 2014 for improperly adjusting his employees' hours.  (30(b)(6) Dep. of Barbara Masticola (dkt. #151) 95:4-15.)

variables resulted in Sales Representatives working a wide range of hours per week at different times of the year.[10]

Also relevant to Sales Representatives' varied daily work experiences, plaintiffs recalled engaging in or observing others engaging in a number of different activities in their downtime, including studying, taking calls from owners and listening in on sales pitches. During downtime, Sales Representatives also played games on their phones, socialized and occasionally left the office to run errands, particularly when they were far down the power line and could expect a long break. Regardless of what they did during downtime, however, plaintiffs contend that generally Wyndham required Sales Representatives to receive permission from managers before leaving the office *and* expected Sales Representatives to remain on the sales floor to await customers. (Dep. of Kyle Wayne Mays (dkt. #152) 74:8-15.)

## OPINION

### I.    Class Certification under Federal Rule of Civil Procedure 23

A two-step analysis governs certification of a class action under Rule 23. *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). First, a class must satisfy the four threshold requirements of Rule 23(a):  numerosity, commonality, typicality and adequacy of representation. *Id.* Second, the party seeking certification must satisfy one of the three alternatives under Rule 23(b). *Id.* The proponent of the

---

[10] Defendant adds that plaintiffs identified several reasons why *Sales Representatives* desired to report low hours worked, including:  to avoid paying back large draw payments from commissions earned in future weeks; to ensure that they would not be prevented by a manager from meeting with a customer due to logging nearly 40 hours; or to remain eligible for unemployment benefits.

class bears the burden of demonstrating that the class meets all of these requirements by a preponderance of the evidence. *Id.*

The trial court must itself engage in a "rigorous analysis" to determine that the requirements of Rule 23 have been satisfied. *CE Design, Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 723 (7th Cir. 2011). As a result, Rule 23 considerations may overlap with the merits of the case. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). Where they do, "the judge must make a preliminary inquiry into the merits." *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001). If material factual disputes exist, the court must even receive evidence and resolve those disputes before determining whether to certify the class, but "should not turn the class certification proceedings into a dress rehearsal for the merits." *Messner*, 669 F.3d at 811.

## A. Rule 23(a) Requirements

### i. Numerosity

Numerosity is satisfied when "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Defendant does not contest that plaintiffs' putative class of In-House Representatives meets the numerosity requirement, and the court is satisfied that a class consisting of 109 individuals is sufficiently large to make joinder impracticable. "The rule of thumb adopted in most courts is that proposed classes in excess of 40 generally satisfy the numerosity requirement." 1 Joseph M. McLaughlin, *McLaughlin on Class Actions* § 4:5 (8th ed. 2011) (collecting cases); *see also Armes v. Sogro, Inc.*, No. 08-C-0244, 2011 WL 1197537, at *2 (E.D. Wis. Mar. 29, 2011) ("The Seventh Circuit has indicated that a group as small as forty may satisfy the

14

numerosity requirement." (citing *Swanson v. Am. Consumer Indus., Inc.*, 415 F.2d 1326, 1333 n.9 (7th Cir. 1969))).

### ii.    Commonality

To satisfy the commonality requirement of Rule 23, plaintiffs must demonstrate there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). A single, common issue will do, although it must be "capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Dukes*, 131 S. Ct. at 2551, 2556. Furthermore, the commonality standard requires that plaintiffs do more than "merely" demonstrate "that they have all suffered a violation of the same provision of law." *Id.* (internal quotation marks omitted). Plaintiff must show that "the class members have suffered the same injury." *Id.*

Plaintiffs offer a number of common questions, but the one that goes to the heart of their class claims is whether Wyndham had an unofficial policy or practice of requiring Sales Representatives to work off-the-clock. Two recent Seventh Circuit decisions are instructive in determining whether putative class claims that a defendant used various methods to implement its unofficial policy of denying overtime satisfies the commonality requirement: *Bell v. PNC Bank, National Association*, 800 F.3d 360 (7th Cir. 2015), and *Ross v. RBS Citizens, N.A.*, 667 F.3d 900 (7th Cir. 2012), *cert granted*, *judgment vacated*, 133 S. Ct. 1722 (2013).[11] In *Ross*, the plaintiff sought certification of two classes

---

[11] The Supreme Court's order vacating and remanding the *Ross* decision for further consideration in light of *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), was not a reversal and, therefore,

consisting of all non-exempt employees and all assistant branch managers who worked at one of defendant Charter One's over 100 bank branches in Illinois. *Id.* at 902-03. Plaintiff Ross alleged that Charter One had:

> an unofficial policy of denying overtime pay to its non-exempt employees by: (1) instructing them not to record hours worked per week over forty; (2) erasing or modifying recorded overtime hours; (3) giving them "comp time" instead of paying overtime; and (4) requiring them to perform work during unpaid breaks.

*Id.* at 903. Of the 1,129 class members of hourly employees, 96 submitted declarations "specifically alleg[ing] that the declarant had been denied lawfully due overtime compensation." *Id.* at 909.

The Seventh Circuit agreed with the district court that plaintiffs satisfied the commonality standard announced by the Supreme Court in *Dukes* concluding, "[a]lthough there might be slight variations in *how* Charter One enforced its overtime policy, both classes maintain a common claim that Charter One broadly enforced an unlawful policy denying employees earned-overtime compensation." *Id.* (emphasis added). The Seventh Circuit further explained that its analysis did not change in light of Charter One's assertion that it vested limited discretion in its branch managers:

> Although there again may be slight variations in the exact dates that each [class member] performs from branch to branch, [they] maintain a common claim that unofficial company policy compelled them to perform duties for which they should have been entitled to collect overtime. Contrary to Charter One's assertion, an individualized assessment of each [class member's] job duties is not relevant to a claim that an unlawful company-wide policy exists to deny [them] overtime pay.

---

"does not negate the precedential authority or persuasiveness of [its] holding and reasoning[.]" *Bell*, 800 F.3d at 375 n.3.

*Id.* at 909-10.

Similarly, in *Bell*, a former employee of PNC Bank sought certification of a class of all non-exempt employees who worked full-time at any one of twenty-seven branches across Illinois during the class period. *See* 800 F.3d at 372. Bell provided evidence that employees from each of the branches complained about being denied overtime for off-the-clock hours they worked, alleging that managers carried out an unofficial policy of denying overtime using various methods such as: (1) requiring them to arrive to work five minutes early but not record those five minute periods; (2) telling them to record a lunch break they did not take, but take an extra paid break the following week; and (3) requesting that they take extra time off rather than report overtime. *See id.* at 369-70.

Borrowing language from the district court's predominance analysis in *Ross v. RBS Citizens, N.A.*, No. 09-CV-5695, 2010 WL 3980113, at *6 (N.D. Ill. Oct. 8, 2010), *aff'd*, 667 F.3d 900 (7th Cir. 2012), the Seventh Circuit again concluded that despite variations as to how unpaid overtime work was treated across the twenty-seven branches, "the number of people making the same allegations across branches, managers, positions, and time frames *has reached a point from which it may be inferred that the common issue of whether a company-wide policy existed to deny overtime will predominate* over the variations in methods used to accomplish the alleged policy." *Bell*, 800 F.3d at 375 (emphasis in original). The *Bell* court added, "[t]he complexity of proof is a problem plaintiffs will have to address in presenting their case on the merits, but it does not negate predominance of the central, common issue. *Id.* (citing *Ross*, No. 09-CV-5695, 2010 WL 3980113, at *6).

Defendant argues that plaintiffs (and by extension the Seventh Circuit) misunderstand the import of the district court's opinion affirmed in *Bell* -- *Gomez v. PNC Bank, N.A.*, 306 F.R.D. 156 (N.D. Ill. 2014) *aff'd sub nom. Bell v. PNC Bank, N.A.*, 800 F.3d 360 (7th Cir. 2015). As defendant reads *Gomez*, "[t]he lynchpin of the [district] court's analysis was that a member of defendant's upper management, a regional manager, expressly stated Defendant had a policy against paying for overtime work." (Def.'s Opp'n (dkt. #176) 12.)

Defendant's reading of *Gomez*, however, is, at best, incomplete, both with respect to the commonality analysis of the district court and, even more importantly, the Seventh Circuit. In laying out the common question whether PNC Bank maintained an unofficial policy of denying pay for overtime work, the district court noted two facts: (1) the named plaintiff and her manager both alleged that a PNC regional manager told them that PNC had an unofficial "policy against paying for overtime work" and (2) "PNC's investigation reports reveal[ed] that employees from at least six other branches alleged that their managers told them that PNC had an unofficial policy against compensating overtime work." *Gomez*, 306 F.R.D. at 166-67. Similarly, the Seventh Circuit in *Bell* did not elevate the regional manager's comments to the level of importance that defendant suggests. Instead, the court mentioned this fact along with three others -- the class representative's allegations, an affidavit submitted by the class representative's manager, and the evidence of other possible overtime work across the 27 branches -- to distinguish *Bell* from those cases in which "low-level managers use their discretion without guidance from an overarching company policy." 800 F.3d at 375.

18

Here, all eleven In-House Sales Representatives who defendant deposed testified about managers at Wyndham's Wisconsin Dells location enforcing an unofficial policy that required them to work off-the-clock to avoid paying overtime.  According to the deposed In-House Sales Representatives, six of eight managers carried out this unofficial policy using methods such as ordering them to clock out at certain times of the day, altering time records and punching them out when they approached 40 hours in a given week.  Also, unlike in *Gomez*, the putative class consists of In-House Sales Representatives in only *one* location, making the deposition testimony from two former In-House Sales Managers who claim that they required In-House Sales Representatives to work off-the-clock *at the direction of their direct supervisors* analogous to that of a regional manager.  Given this evidence -- along with plaintiff's analysis of the Payment Gateway data that demonstrates In-House Sales Representatives were, with some frequency, clocked out while still with customers in back-end meetings -- whether an unofficial policy or practice requiring In-House Sales Representatives to work off-the-clock at Wyndham's Wisconsin Dells office existed is capable of class-wide resolution.

Despite this caselaw, defendant further challenges the existence of commonality by emphasizing differences among specific instructions to work off-the-clock that In-House Sales Representatives testified they actually received from managers.  Even if plaintiffs could point to a single unlawful policy, defendant argues that the testimony of In-House Sales Representatives demonstrates that plaintiffs have not established that it affected them in a common way.  Finally, defendant stresses that plaintiffs' analysis of

the Payment Gateway data cannot establish that *Wyndham* enforced an unofficial overtime policy.

Each of these three, legitimate arguments underscore why plaintiffs might have a difficult time ultimately proving the existence of an unofficial policy requiring Sales Representatives to work off-the-clock at the Wyndham's Wisconsin Dells location, but plaintiffs have also presented sufficient evidence to satisfy their burden of showing that this question can be answered on a class-wide basis.  Despite the differences in the methods managers allegedly used to carry out an unofficial policy, all eleven In-House Sales Representatives who defendant deposed testified that an In-House Sales Manager ordered them to punch out and work off-the-clock.[12]  Moreover, the deposed In-House Sales Representatives named at least seven individuals who required them to work off-the-clock of the nine different In-House Sales Managers or Directors who worked at the Wisconsin Dells office during the relevant class period.[13]  (Pls.' Reply Br. (dkt. #189) at 12.)

---

[12] (Dep. of Thomas Bitner (dkt. #27) 262:22-263:4; Dep. of Abraham Haupt (dkt. #29) 97:25-98:22; Dep. of Nathan G. Weyh (dkt. #141) 108:21-25; Dep. of Justin R. Keegan (dkt. #139) 23:19-25; Dep. of Christopher F. Sinople (dkt. #155) 127:4-128:2; Dep. of Martin G. Mohr (dkt. #153) 72:21-73:6; Dep. of Christian L. Schartner (dkt: #154) 68:13-21; Dep. of Ernest B. Lynch (dkt. #138) 73:7-25; Dep. of Sean D. Sweeney (dkt. #156) 116:2-5; Dep. of Margaret L. Zautke (dkt. #137) 137:11-138:3; Dep. of Casey O'Donnell (dkt. #142) 58:5-19, 59:24-60:18.)

[13] (Dep. of Abraham Haupt (dkt. #29) 97:25-98:22 (Managers Tom Delmore, Christine Kwitek, Lance Tinsley and Director Kyle Mays); Dep. of Christopher F. Sinople (dkt. #155) 127:20-128:2 (Manager Casey O'Donnell); Dep. of Christian L. Schartner (dkt. #154) 68:3-15 (Manager Cody Childs); Dep. of Ernest B. Lynch (dkt. #138) 73:17-21 (Manager Dave Brown and Director Don Tansor); Dep. of Casey O'Donnell (dkt. #142) 90:9-23 (Director Borelli).)

And plaintiffs have advanced other evidence supporting a finding of commonality, including Wyndham's internal investigation of and disciplinary action against several In-House Sales Managers and Directors, as well as the analysis of the Payment Gateway data.  With respect to the investigation, Wyndham's identification of several managers' improper timekeeping practices -- particularly in light of the deposition testimony from several In-House Sales Representatives that managers continued the unofficial off-the-clock policy after the investigation and Wyndham's remedial efforts -- supports plaintiff's allegation of a policy implemented by managers.  *See Bell*, 800 F.3d at 379 ("But PNC's efforts to cure errors doesn't resolve all of the questions regarding liability. Even when cured, the evidence could leave a court resolving the case on the merits to resolve whether . . . the efforts to cure were necessary because of a previously unwritten policy[.]").  Similarly, even though defendant has pointed out possible problems with plaintiffs' treatment of Payment Gateway data, plaintiffs' analysis still corroborates the In-House Sales Representatives who testified that managers required them to clock out before conducting back-end meetings or when they recorded nearly 40 hours in a week. Furthermore, two In-House Sales *Managers* testified at their depositions that their immediate supervisors, In-House Sales *Directors*, ordered or encouraged them to have Sales Representatives perform work off-the-clock.

### iii.   Typicality

Typicality for Rule 23(a) purposes requires that a named plaintiff's claim "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Keele v. Wexler*,

149 F.3d 589, 595 (7th Cir. 1998) (quoting *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)).  For this reason, typicality often tends to overlap with the commonality requirement.  *See Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 157 n.13 (1982).  Applied with care, however, the typicality standard should ensure that "a plaintiff with typical claims will pursue his or her own self-interest in the litigation and in so doing will advance the interests of the class members, which are aligned with . . . those of the representative." *Insolia v. Phillip Morris, Inc.*, 186 F.R.D. 535, 544 (W.D. Wis. 1998) (quoting 1 Newberg & Conte, *Newberg on Class Actions* § 3.13 (3d ed. 1992)).

In challenging typicality, defendant again emphasizes the differences among the methods managers allegedly used to require In-House Sales Representatives to work unpaid overtime, adding that several who now claim unpaid overtime have credibility issues regarding their allegations about the number of hours they worked per week.  As an initial matter, the apparent credibility issues defendant identifies as to *some* Sales Representatives need not be resolved to decide whether class certification is appropriate. Ultimately, the trier of fact must evaluate arguments plaintiffs have offered for resolving the apparent conflict between the number of hours that Sales Representatives testified to working per week at their depositions and their interrogatory responses or prior sworn statements or applications for unemployment assistance, which suggest fewer hours worked, but that is for the trier of fact.

As for variations in alleged off-the-clock directives that the defendant rightly highlights, none establishes that plaintiff Bitner's interests deviate from those of the class

22

as a whole.  To the contrary, while plaintiffs have alleged that managers used several, different methods to deny overtime, the evidence presented -- including Bitner's deposition testimony, as well as the deposition testimony of other In-House Sales Representatives -- is sufficient for the trier of fact to find that each of the different methods managers allegedly used to require off-the-clock work were all in furtherance of a single, unofficial policy to deny Sales Representatives of otherwise proper overtime compensation.  Bitner's claim for off-the-clock work is, therefore, typical of the other class members in satisfaction of Rule 23(a)(3).

### iv.    Adequacy of Representation

The adequacy requirement of Rule 23 ensures that "representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  A class representative is *not* adequate if he is subject to a defense to which other class members are not subject or could not prove the elements of the class claim for reasons particular to him.  *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 724-25 (7th Cir. 2011).

In its opening brief, Bitner argues that he is an adequate representative of the class because he suffered the same alleged injury and seeks the same relief as members of the putative class, as well as personally participated in discovery.  Defendant makes no independent argument attacking plaintiffs' adequacy to represent the class, instead recycling the same reasons it gave for opposed commonality and typicality, which in fairness are often merged together.  *See CE Design*, 637 F.3d at 724.  Likely for these

reasons, plaintiffs similarly fail to address defendant's challenge Bitner's adequacy as a class representative. (*See* Pl.'s Reply (dkt. #189) 31 n.9.)

As already discussed, Bitner does not claim that he was required to perform off-the-clock work in *precisely* the same way as some of the other deposed In-House Sales Representatives. At the same time, defendant identifies no defenses particular to Bitner; nor any challenges he alone will face in proving the class claim; and it appears that Bitner's claims are consistent with those of the class as a whole. Plaintiff has sufficiently demonstrated that Bitner is an adequate representative of the putative class under Rule 23(a).

Adequacy of representation also requires that class counsel be qualified to conduct the litigation. *See Reliable Money Order, Inc. v. McKnight Sales Co.*, 704 F.3d 489, 498 (7th Cir. 2013) (applying "serious doubt" standard to assessing whether class counsel can adequately represent the interest of the class). Defendant does not challenge the adequacy of plaintiffs' counsel, Hawks Quindel, S.C. and Nichols Kaster, PLLP. Both firms have submitted declarations detailing the extensive experience of the firms and the four attorneys representing the class. (Decl. of Timothy C. Selander (dkt. #166); Decl. of David C. Zoeller (dkt. #172).) The court, therefore, finds class counsel to be qualified under Rule 23(a)(4) as well.

## B. Rule 23(b)(3) Requirements

After satisfying the four requirements of Rule 23(a), a plaintiff must still fulfill at least one of the requirements of Rule 23(b) for certification of a class action. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 716 (7th Cir. 2012). Here, plaintiff moves for

24

certification under Rule 23(b)(3), which requires a plaintiff to show both that:  (1) "questions of law and fact common to class members predominate over any questions affecting only individual members"; and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

### i.     Predominance

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 623. The predominance requirement is not satisfied if "individual questions . . . overwhelm questions common to the class." *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 133 S. Ct. 1184, 1196 (2013).  Ultimately, to satisfy predominance, the case must be one "in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods.*, 521 U.S. at 615 (quoting Fed. R. Civ. P. 23(b)(3) advisory committee note to 1966 Amendment).

Mirroring its arguments challenging commonality, defendant argues that plaintiffs cannot establish predominance for several reasons.  As an initial matter, defendant contends that individualized questions predominate over common ones because "[w]hile it is true all In-House Reps generally claim they were told to work [off-the-clock], they cannot agree on details." (Def.'s Opp'n (dkt. #176) 30.)  Additionally, defendant argues that because of significant variations in the deposition testimony of the In-House Sales Representatives, individualized inquiries will be necessary into (1) how much off-the-clock work each class member performed, (2) what activities each member

25

engaged in during downtime, and (3) whether managers knew or should have known about each member's unpaid work.   Finally, defendant argues that the individual credibility of each deposed In-House Sales Representative will need to be tested and resolved.

With respect to defendant's first argument, while plaintiffs affirmatively allege that Wyndham's managers used *various* methods to deny overtime in contradiction of written policy, plaintiffs also allege that managers enforced an unofficial policy to injure members of the putative class.   Moreover, In-House Sales Representatives generally testified that managers required them to work off-the-clock by: (1) directing them to clock out at certain times each day or not clock in for certain work activities; (2) ordering them to punch out when they approached clocking 40 hours in a week; and (3) arbitrarily altering time records to reduce the number of hours an worked in a given week.   These similarities across the testimony of the eleven deposed Sales Representatives appear to outweigh their differences.   As in *Ross,* plaintiff's evidence "has reached a point from which it may be inferred that the common issue of whether a [branch]-wide policy existed to deny overtime will predominate over the variations in methods used to accomplish the alleged policy."   No. 09 CV 5695, 2010 WL 3980113, at *6.

Defendant's other arguments likewise fail to defeat predominance.   Contrary to defendant's assertion, a trier of fact can certainly determine on a class-wide basis whether managers were aware or should have been aware of what In-House Sales Representatives were doing on the sales floor between meetings with customers.   In contrast, the number

of hours individual class members worked off-the-clock is a question for damages, not

liability.  On this point, *Bell* instructs how the predominance inquiry should be framed:

> [T]he class claim that PNC had an unofficial policy that left
> it liable under the Fair Labor Standards Act and Illinois Law
> would prevail or fail for the class as a whole.  "In no event will
> the individual circumstances of particular class members bear
> on the inquiry."  *Amgen*, 133 S. Ct. at 1191.  It makes no
> difference to the class claim as a whole how many hours of
> off-the-clock work each employee worked or the intent of the
> manager.  *These would be issues for the portion of the suit in which
> individual damages are assessed* . . . . In other words, "[a] failure
> of proof on the *common* question . . . ends the litigation and
> thus will never cause individual questions of reliance or
> anything else to overwhelm questions common to the class."
> *Amgen*, 133 S. Ct. at 1196.

800 F.3d at 378-79 (first emphasis added).

Under *Bell*, therefore, questions concerning damages for individual class members,

such as the number of hours each employee worked, do *not* predominate over the

common contention regarding the existence of an unofficial policy.  Indeed, even the

potential for "scores of separate trials" to determine the extent to which each class

member actually suffered a loss as a result of a policy does not preclude certification

because "[a]t least it will not be necessary in each of those trials to determine whether

[defendant] had an illegal policy of denying pay for off-the-clock work."  *Id.* at 379-380;

*see also McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 491 (7th

Cir. 2012).  Accordingly, plaintiffs have made a sufficient showing under Rule 23(b)(3)

that common issues will predominate over individual issues.

ii.   **Superiority**

Under Rule 23(b)(3), the court must also determine whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  Relevant matters for consideration include class members' interests in individually litigating their claims; the extent and nature of competing litigation; the desirability of concentrating the litigation in the particular forum; and the likely difficulties of managing a class action. *Id.*

In challenging superiority, defendant again largely rehashes its arguments concerning commonality and predominance.   So, too, is the court's response. Specifically, Wyndham argues that "[t]he wide variation between the work experiences and the factors which influence employees' hours worked and claimed [off-the-clock] work" are individualized liability issues that cannot accurately be resolved through common proof.  Given that plaintiff seeks to establish an unofficial policy, however, determining liability will *not* necessitate separate trials.  While determining damages may well require separate trials, or at least individualized proof, the Seventh Circuit has already ruled that the need for separate damages trials does not preclude a finding of superiority. *See Bell*, 800 F.3d at 379-80 ("If the class prevails in demonstrating that PNC had an unofficial policy or practice that required employees class-wide to work off-the-clock overtime hours, scores of separate trials might be necessary to determine which class members were actually adversely affected by the policy and if they were, what loss each class member sustained. At least it will not be necessary in each of those trials to determine whether PNC had an illegal policy of denying pay for off-the-clock work.").

28

In fact, a single, class trial on whether an unofficial policy existed is far superior in terms of efficiency to requiring multiple individual actions seeking resolution of the same liability question.  Of course, there is also no guarantee that class members would bring their own lawsuits, since litigation costs may outweigh individual damages for many class members.  *See Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013).  For these reasons, the court agrees with plaintiffs that a class action is a superior method of adjudication.

## C. Certification of Class

Consistent with the discussion above, the court will grant certification of a class of In-House Sales Representatives under Rule 23(b)(3).  Plaintiff Thomas Bitner may represent the following class:

- All persons who were employed by Wyndham Vacation Resorts, Inc., in the State of Wisconsin as In-House Sales Representatives at any time from June 25, 2011, to [a date in fall of 2014 to be determined by the parties or court].

A district court's grant of certification, however, is not final.  *See Eggleston v. Chi. Journeymen Plumbers' Local Union No.* 130, 657 F.2d 890, 896 (7th Cir. 1981) ("[A] favorable class determination by the court is not cast in stone.  If the certification of the class later deemed to be improvident, the court may decertify[.]"); *Espenscheid v. DirectSat USA LLC,* No. 09-cv-625-bbc, 2011 WL 2009967, at *7, *aff'd*, 705 F.3d 770 (7th Cir. 2013).  Therefore, the court encourages plaintiffs to continue to develop a trial plan that will ensure this case remains manageable as a class action.

### D. Notice

For any class action certified under Rule 23(b)(3), the court "must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Notice must clearly, concisely, and comprehensibly state: (1) the nature of the action; (2) the class definition; (3) the class claims, issues or defenses; (4) that a class member may enter an appearance through an attorney should he or she desire; (5) that the court will exclude any class member requesting exclusion; (6) the time and manner for requesting exclusion; and (7) the binding effect of a class judgment on class members, regardless of whether a member may have a stronger individual claim of liability not dependent on proof of an unofficial policy to deny overtime pay. *Id.*

Plaintiffs have drafted a proposed notice form and propose to send it to class members via first class mail.[14] (Dkt. #173.) Given that defendant has not yet responded to the proposed form and method of notice, and the parties must agree on the end date defining the class period, the court will direct that the parties confer on these issues within fourteen days of this order. Unless the parties jointly file an acceptable form *and* method of notice, both sides are to file their individualized, proposed form and method of notice, and the court will hold a telephonic hearing on January 25, 2017, at 1:00 p.m. to arrive at both.

---

[14] This court's general practice is to require posting of the notice at the workplace in addition to mailing. Thus, the parties should keep that requirement in mind in developing a proposed notice and means of dissemination.

## II.    Decertification of Conditionally Certified FLSA Classes

The court now turns to defendant's motion to decertify both conditionally certified classes of In-House Sales Representatives and Discovery Sales Representatives under a two-step process.  The FLSA enables employees to bring their "claims through a 'collective action' on behalf of themselves and other 'similarly situated' employees." *Alvarez v. City of Chi.*, 605 F.3d 445, 448 (7th Cir. 2010) (citing 29 U.S.C. § 216(b)).  In determining whether opt-in plaintiffs are similarly situated, district courts in this circuit consider whether: (1) their factual and employment settings are similar; (2) affirmative defenses available to the defendant must be applied individually to each plaintiff; and (3) fairness and procedural concerns weigh in favor of a collective action.  *See, e.g., Gomez*, 306 F.R.D. at 174; *Espenscheid*, No. 09-cv-625-bbc, 2011 WL 2009967, at *4.

The Seventh Circuit has acknowledged the blurring of lines between the nominally different standards governing class actions under Rule 23 and collective actions under the FLSA.  *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 772 (7th Cir. 2013) ("[T]here isn't a good reason to have different standards for the certification of the two different types of action[.]").  Concluding that the different consequences between the opt-in procedure for collective action under the FLSA and the opt-out requirement of a class action governed by Rule 23(b)(3) were of no consequence in *Espenscheid*, the court treated the FLSA classes and Rule 23 classes together, as a single class.  *Id.* at 771-72.  Since the discussion of the Rule 23 class of In-House Sales Representatives above adequately addresses each of the considerations under the FLSA "similarly situated" analysis, the court will deny defendant's motion to decertify the opt-in collective class with respect to

31

those individuals.  On the other hand, since they fall outside of the class just certified, the defendant's motion to decertify the conditionally-certified FLSA collective action on before of *Discovery* Sales Representatives is deserving of discussion.

### A.  Similarity of Factual and Employment Settings

As was the case in its opposition to plaintiffs' motion for conditional certification, much of defendant's opening brief in support of its motion for decertification blurs the two separate classes, making much of its argument difficult to sort out.  (*See* 7/25/14 Op. & Order (dkt. #92) at 7.)  Nevertheless, with respect to the first factor, concerning the similarity between the factual and employment settings of the opt-in plaintiffs, the opt-in class of Discovery Sales Representatives at Wyndham's Wisconsin Dells location all share the same title and general job responsibilities.  Moreover, the limited differences that defendant would emphasize -- principally with respect to the number of hours they worked and the activities in which they engaged during downtime -- are not sufficient to undermine a finding that this first factor is met.  *See Alvarez v. City of Chi.*, 605 F.3d 445, 449 (7th Cir. 2010) ("If common questions predominate, the plaintiffs may be similarly situated even though the recovery of any given plaintiff may be determined by only a subset of those common questions.).

### B.  Affirmative Defenses

Likewise, the second factor -- whether affirmative defenses must be applied on an individual, as opposed to a collective, basis -- also weighs in favor of proceeding as a collective action.  Even those defenses that defendant argue need to be applied

individually, can be decided collectively.  For example, there is nothing particularly unique or individualized to the question whether Discovery Sales Representatives were entitled to compensation during downtime between meetings with customers.  On the contrary, this is just a subset of the class issue that the court has already certified -- *i.e.*, was an unofficial policy adopted that required Discovery Sale Representatives to wait for the next potential customer.  Put differently, "the critical issue in determining whether an employee should receive compensation for idle time is whether the employee can use the time effectively for his or her own purposes."  *Mireles v. Frio Foods, Inc.*, 899 F.2d 1407, 1411 (5th Cir. 1990) (citing 29 C.F.R. §§ 785.16-.17); *see also Dinges v. Sacred Heart St. Mary's Hosps., Inc.*, 164 F.3d 1056, 1057 (7th Cir. 1999) ("[T]he answer depends on whether one has been "engaged to wait" or is "waiting to be engaged.") (citing *Armour & Co. v. Wantock*, 323 U.S. 126 (1944); *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)).

While defendant asserts that Discovery Sales Representatives *sometimes* left the office to engage in their own personal pursuits, the evidence is conflicting at best on this issue.  In particular, at least one Discovery Sales Representative testified that approval from a manager was required before leaving the office because they were generally expected to be available to meet with customers at any time.  (Dep. of Abraham Haupt (dkt. #29) at 165:4-15.)   Accordingly, the issue of whether downtime between meetings was compensable still appears to be best decided on a class-wide basis.

The defendant further argues that two of the defenses must be determined on an individualized basis:  (1) whether any compensation Discovery Sales Representatives received for engaging in "non work-related" activities while at work should be offset; and

33

(2) whether managers had no reason to know of any off-the-clock work allegedly performed by plaintiffs.  Yet both these questions can also be determined collectively, because both are also subsets of the larger question as to whether downtime was compensable.

Defendant's next argument -- that the lack of a consistent work schedule among Discovery Sales Representatives necessitates individualized inquiries into what managers knew about each opt-in plaintiff's claimed off-the-clock work -- fails for similar reasons. Plaintiffs have provided collective evidence that:  (1) Discovery Sales Representatives were required to get manager permission before leaving the facility; and (2) Wyndham pressured its managers to keep close track of the hours their employees recorded, in significant part because the number of hours employees recorded was a metric on which they were evaluated.

Finally, defendant once again argues that issues of credibility prevent what managers said to Discovery Sales Representatives regarding off-the-clock work from being decided collectively.  For reasons already addressed, however, a trier of fact, not the court on a motion for decertification of a collective action, must resolve disputed questions of fact regarding the existence of an unofficial policy of requiring unpaid off-the-clock work and whether Wyndham's managers enforced the alleged policy.

## C. Fairness and Procedural Concerns

Although a much closer question, the third factor also weighs against decertifying the class of Discovery Sales Representatives and requiring them to pursue individual actions at this time.  Certainly, there are valid reasons to proceed with claims by opt-in,

Discovery Sales Representatives on an individualized basis given (1) their small number, (2) the variations in their daily work experiences, and (3) the number of hours they worked.  The court must balance defendant's fairness concerns, however, with the due process rights of plaintiffs.  *See, e.g., Russell v. Ill. Bell Tel. Co., Inc.*, 721 F. Supp. 2d 804, 824 (N.D. Ill. 2010).  Particularly in light of the remedial purposes of the FLSA, the court must at least factor in the possibility that some potential plaintiffs would not pursue individual claims because the promise of receiving damages is too small to justify the expenditure of their time in individual lawsuits.  *See Falcon*, 580 F. Supp. at 541.  Of course, given the small number of class members, it is unclear what additional time would really be required, but there would likely be some loss of efficiency when divorcing the few Discovery Sales Representatives from the In-House Sales Representatives proceeding by class action.

Regardless, defendant's fairness and due process concerns can be mitigated by bifurcating the determinations of liability and damages.  Similarly, although individualized facts regarding the number of hours worked and amount received in commissions relevant to the compensation formula common to all class members will vary, the court can "appoint a special master to resolve a difficult computation of damages."  *Alvarez v. City of Chicago*, 605 F.3d 445, 449 n.1 (7th Cir. 2010) (internal quotation marks omitted) (quoting Fed. R. Civ. P. 53(a)(1)(B)(ii)).

For these reasons, the court will deny defendant's motion for decertification at this time.  That said, as indicated above in the discussion of certification of a Rule 23 class, plaintiffs should develop a trial plan carefully to ensure the manageability of this

case, and defendants are free to revisit the appropriateness of class treatment should the number of members of the Discovery Sales Representatives class under the FLSA decline by virtue of failure to prosecute or settlement.

### III.   Partial Summary Judgment Motions

#### A.  Plaintiffs' Motion

Plaintiffs seek summary judgment on three discrete elements of claims, which the court will address each in turn.  *First*, plaintiffs argue that they are entitled to prove damages under the burden-shifting framework of *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946), *superseded on other grounds by statute*, Portal-to-Portal Act of 1947, 29 U.S.C. §§ 251-262.  In *Mt. Clemens*, the Supreme Court announced that consistent with the remedial purpose of the FLSA, plaintiffs who can demonstrate that their employer's time records are unreliable should not be held to an "impossible" burden of proof as to damages.  *Id.* at 687.  Accordingly, the court held that:

> an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.  The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.  If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

*Id.* at 687-88.

Obviously, to the extent *Mt. Clemens* remains good law, plaintiffs are entitled to this general instruction.  They are, however, entitled to no more on summary judgment since it is unclear that plaintiffs can meet their initial burden of proof on this record.

As previously discussed, while a number of Sales Representatives now testify that their time records are inaccurate, several signed sworn declarations and affidavits affirming the accuracy of Wyndham's records.  Moreover, a dispute also remains regarding the import of the Payment Gateway data.  Both disputes make summary judgment inappropriate at this stage.

Of course, the *Mt. Clemens* burden-shifting framework will be available at trial to plaintiffs who satisfy the trier of fact that:  (1) he or she performed work for which no proper compensation was provided; and (2) there is sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.  The parties may brief specifically how and when the court should so instruct the jury as part of their pretrial submissions.

*Second*, plaintiffs seek summary judgment against Wyndham on the FLSA "good faith" defense to liquidated damages.  Under the FLSA, an employer is liable for liquidated damages as provided in 29 U.S.C. § 216(b) unless it "shows to the satisfaction of the court that the act or omission giving rise to [the FLSA] action was in good faith and that [it] had reasonable grounds for believing that [the] act or omission was not a violation of the Fair Labor Standards Act[.]"  29 U.S.C. § 260.  The court agrees with defendant that the question of Wyndham's good faith is best answered after a finding of liability at trial.  Particularly given the disputes regarding the thoroughness of

Wyndham's investigation, claims of continual violations after the investigation, and the compensability of Sales Representatives' downtime, the court will deny summary judgment as to a finding that Wyndham did not act in good faith.  Of course, depending upon the strength of the evidence actually presented at trial and the jury's finding that Wyndham itself had an unofficial policy of not compensating Sales Representatives, the court may revisit this question before proceeding to a determination of damages.

*Third*, plaintiffs seek for the court to find as a matter of law that Wyndham had actual or constructive knowledge of Sales Representatives performing off-the-clock work. In support of that argument, plaintiffs cite former employees' deposition testimony that: (1) managers ordered Sales Representatives to work off-the-clock; (2) Sales Representatives did work on the sales floor in sight of managers; and (3) managers were expected to keep close track of the number of hours their employees recorded. Defendant refutes plaintiffs' contention that managers knew about off-the-clock work, pointing to the differences in the daily work experiences of Sales Representatives and the variations in downtime, in particular.  The court again agrees with defendant that the issue of managers' actual or constructive knowledge is a question that must be determined at trial.  Accordingly, the court will deny plaintiffs' motion for summary judgment.

### B.  Defendant's Motion

Defendant also moves for partial summary judgment, seeking a finding that the FLSA overtime requirement does not apply to Discovery Sales Representatives under the exemption for commissioned salespersons under 29 U.S.C. § 207(i).  For the exemption

to apply, defendant must prove the following three requirements: (1) the employee must work at a retail or service establishment; (2) the employee's regular pay exceeds one and one half times the federal minimum wage; and (3) more than half of the employee's compensation over a representative period of at least one month consists of commissions on goods or services. *Alvarado v. Corp. Cleaning Servs., Inc.*, 782 F.3d 365, 366 (7th Cir. 2015) (quoting 29 U.S.C. § 207(i)); *see also Kellar v. Summit Seating Inc.*, 664 F.3d 169, 173 (7th Cir. 2011) ("The employer bears the burden to establish that an exemption from the FLSA applies.").

In briefing, the parties focus on the first prong -- whether Wyndham qualifies as a retail or service establishment.  The determination of whether Wyndham "is a retail or service establishment is a matter of statutory construction and is thus a question of law to be determined by the [c]ourt." *Reynolds v. Wyndham Vacation Resorts, Inc.*, No. 4:14-CV-2261-PMD, 2016 WL 362620, at *5 (D.S.C. Jan. 29, 2016).

Courts have traditionally applied the DOL regulations defining a retail or service establishment under the now repealed intrastate business exemption, *see* 29 U.S.C. § 213(a)(2), since Congress (1) originally intended for the regulation to apply to both exemptions, and (2) has not yet modified the regulation's definition. *See Reich v. Cruises Only, Inc.*, No. 95-660-CIV-ORL-19, 1997 WL 1507504, at *2 (M.D. Fla. June 5, 1997). However, the Seventh Circuit has more recently called into question the applicability of the § 213(a)(2) definition and its associated, outdated list of establishments lacking a "retail concept" under another DOL regulation, 29 C.F.R. § 779.317. *See Alvarado*.  782 F.3d at 371.

39

Plaintiffs further direct the court to cases in other districts courts considering the application of this exemption to FLSA claims brought by sales representatives of timeshares.  In the two cases identified, plus a more recent case involving the same defendant, courts have determined that the employers are not a retail or service establishment for purposes of determining the application of the 7(i) exemption.  *See Reynolds v. Wyndham Vacation Resorts, Inc.*, No. 4:14-cv-2261-PMD, 2016 WL 362620, at *5 (D.S.C. Jan. 29, 2016); *Davidson v. Orange Lake Country Club, Inc.*, No. 6:06-cv-1674-Orl-19KRS, 2008 WL 254136, at *5-*6 (M.D. Fla. Jan. 29, 2008); *Williams v. Trendwest Resorts, Inc.*, No. 2:05-CV-0605-RCJ-LRL, at *6-*9 (D. Nev. Aug. 20, 2007), *disagreed with on other grounds by Busk v. Integrity Staffing Solutions, Inc.*, 713 F.3d 525 (9th Cir. 2013).  These cases, however, all focus on DOL regulations, which the Seventh Circuit rejected in *Alvarado.*  Moreover, unlike the sales representatives at issue in those cases, the Discovery Sales Representatives here do not sell real estate interests.  (Def.'s Br. (dkt. 315) 21.)

While the *Alvarado* opinion is helpful in describing what courts should *not* rely upon in determining whether the 7(i) exemption applies, the opinion falls short of providing guidance as to what district courts *should* rely on in determining whether a business qualifies as a retail or service establishment.  At a minimum, the *Alvarado* court articulates three basic requirements:  (1) the business not be a wholesale business (782 F.3d at 369); (2) its unit of sale be recognized in the industry (*id.* at 370); and (3) it makes sales to the public, albeit not necessarily the general public (*id.* at 371).

Since three of these minimum requirements appear to be met here, the court's focus turns to whether the application of the commissioned salesperson exemption would

40

further the FSLA's purpose.  *See Alvarado*, 782 F.3d at 371 ("The Department of Labor and some courts have woodenly ported the definition from section 213(a)(2) to the commission exemption with no sensitivity to the very different purpose of that exemption.").  *Alvarado* explains that the central reason for the commissioned salesperson exception is to control for the unexplainable anomaly in pay between employees who can expect to work a consistent number of hours each week and those who work the same total number of hours but have irregular work time.  *See id.* at 369.  ("The result of these impediments to steady work is that a window washer can't count on working 40 hours each week for an entire year.  This is the reason for exempting his employer from the requirement of paying the worker time and half for overtime.").

Because the regularity of the hours worked by Discovery Sales Representatives remains in dispute here, this court cannot determine on summary judgment whether Wyndham is a retail or service establishment under the meaning of the commissioned salesperson exemption.  Even if the court could decide this element on the papers before it, there are fact issues with respect to the second and third *Alvarado* prongs -- that the employee's regular pay exceeds one and one half times the federal minimum wage and that more than half of the employee's compensation over a representative period of at least one month consists of commissions on goods or services.  As an initial matter, defendant claims to show that all three elements of the commissioned salesperson exemption apply to Discovery Sales Representatives, generally, but its analysis purports to calculate the compensation received by only five members of the opt-in class.  (Decl. of Scott Pechaitis Ex. B (dkt. #217-2).)  Moreover, defendant acknowledges that its

41

findings demonstrate that Discovery Sales Representatives satisfy the commissioned salesperson exemption only for "a substantial number of weeks," rather than for all weeks.  (Def.'s Opening Br. (dkt. #215) 25.)   Based on these incomplete findings, defendant nevertheless argues the court "should grant Wyndham's Motion for such weeks and dismiss [plaintiffs'] claims."  (*Id.*)

Even interpreting defendant's motion as seeking to preclude plaintiffs from claiming FLSA overtime damages for the weeks it identified for several Discovery Sales Representatives, factual disputes would still preclude the court finding these elements satisfied as a matter of law.  For example, in response to the motion, plaintiff argues that defendant's analysis of the Discovery Sales Representatives' compensation over a representative period is flawed because defendant poorly defines that period.   DOL regulations concerning the representative period requirement under the Section 7(i) exemption instruct the employer to select "a period which typifies the total characteristics of an employee's earning pattern in his current employment situation, with respect to the fluctuations of the proportion of his commission earnings to his total compensation."   29 C.F.R. § 779.417(a).  Plaintiff contends that defendant's analysis does not properly account for a representative period for each Discovery Sales Representative since -- by arguing that Discovery Sales Representatives received nearly all of their compensation in commissions simply because their minimum wage draw balance was very small by the end of their employment with Wyndham -- it appears that defendant considered the appropriate representative period to be the entire period of employment.

42

Defendant fails to reply to that argument, and in addition, there remain material disputes as to what the proper representative period is and as to the number of hours each opt-in Discovery Sales Representative worked.  For all of these reasons, the court will deny defendant's partial motion for summary judgment at this time.

## IV.   Defendant's Motion to Dismiss Four Opt-Ins

Finally, defendant seeks to dismiss four opt-in plaintiffs, John Montzingo, D'Andrye Arthur, Jason Klidies and John Wicklander, based on their failure to respond to defendant's discovery requests and deposition notices.  (Dkt. #246.)  Plaintiffs do not oppose the dismissal of these four opt-in plaintiffs, but contend that the dismissal should be without prejudice given the chance that these individuals may still "present themselves to respond to discovery prior to the close of discovery."  (Pls.' Resp. (dkt. #249) 2.)  For its part, defendant argues that "dismissing Plaintiffs without prejudice and allowing them to move for reinstatement prior to the discovery cut-off is no real consequence at all." (Def.'s Reply (dkt. #251) 2.)

While the court is sympathetic to defendant's position, dismissing a claim with prejudice under Federal Rule of Civil Procedure 37 is "an extreme sanction that should be used only as a last resort in situations where the noncomplying party displayed willfulness, bad faith or fault."  *Sanders v. Sears*, No. 11-CV-202-SLC, 2013 WL 2302052, at *1 (W.D. Wis. May 23, 2013).  The record, here, is not so egregious to warrant dismissal with prejudice, though the court will view skeptically any last-minute motion to reopen brought by the four dismissed named plaintiffs, as well as entertain a motion to dismiss *with prejudice* at the close of this case.

43

ORDER

IT IS ORDERED that:

1) Defendant's motion for decertification (dkt. #157) is DENIED;

2) Plaintiff's motion for class certification (dkt. #163) is GRANTED;

    a) The court certifies the following class pursuant to Rule 23(b)(3):

    All persons who were employed by Wyndham Vacation Resorts, Inc. in the State of Wisconsin as In-House Sales Representatives at any time from June 25, 2011, to [a date in fall of 2014 to be determined by the parties].

    b) The court appoints Thomas Bitner as class representative

    c) The court appoints Hawks Quindel, S.C., and Nichols Kaster, PLLP, as class counsel.

3) Plaintiff's motion for partial summary judgment (dkt. #204) is DENIED;

4) Defendant's motion for partial summary judgment (dkt. #214) is DENIED; and

5) Defendant's motion to dismiss (dkt. #246) is GRANTED.  The claims by opt-in plaintiffs John Montzingo, D'Andrye Arthur, Jason Klidies and John Wicklander are dismissed without prejudice.

6) On or before two weeks, the parties should submit a joint proposed form and method of notice, or if unable to agree, plaintiffs should submit their own proposed notice, with defendant to respond by January 18, 2017.  If necessary, the court will hold a brief hearing on January 25, 2017, at 1:00 p.m. to finalize both.

Entered this 28th day of December, 2016.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

44